UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAZERAC COMPANY, INC., et al., | Case No. 3:15-cv-04618-WHO |
| Plaintiffs, | |
| v. | **ORDER ON FETZER'S MOTION FOR SUMMARY JUDGMENT** |
| FETZER VINEYARDS, INC., | Re: Dkt. No. 63 |
| Defendant. | |

### INTRODUCTION

Plaintiffs Sazerac Company, Inc. and Sazerac Brands, LLC (collectively, "Sazerac")

brought this action for federal trademark and trade dress infringement and unfair competition

against Fetzer Vineyards, Inc. ("Fetzer"). Sazerac alleges that Fetzer's 1000 Stories Zinfandel

buffalo mark and trade dress infringe its BUFFALO TRACE word mark, Buffalo Logos, and trade

dress for its BUFFALO TRACE bourbon whiskey. Fetzer moves for summary judgment on all of

Sazerac's claims, on the grounds that they are necessarily predicated on Sazerac asserting rights

over the generic term "bourbon," which it cannot do, and because Sazerac has failed to

demonstrate a likelihood of confusion. But Fetzer mischaracterizes Sazerac's claims and

overlooks its evidence. Sazerac has demonstrated a triable issue whether consumers are likely to

be confused by Fetzer's buffalo and trade dress on its 1000 Stories Zinfandel. But because

Sazerac failed to disclose properly how it would prove any monetary damages, it is not entitled to

recover them. Fetzer's motion for summary judgment is GRANTED concerning Sazerac's ability

to recover monetary damages and its infringement claims for six of the trademarks. Fetzer's

motion is DENIED regarding the other two marks and the trade dress.

**BACKGROUND**

I. **FACTUAL BACKGROUND**[1]

    A.     **Sazerac's Buffalo Trace Brand**

Sazerac owns the Kentucky-based Buffalo Trace Distillery, "the oldest continuously operating distillery in the United States." Sazerac's Response to Interrogatories at 4:2–3 (Hadid Decl. Ex. A; Dkt. No. 76-2). The Distillery is a national historical landmark listed with the United States National Park Service. *Id.* In 1999, Sazerac adopted the Buffalo Trace name and introduced its BUFFALO TRACE brand bourbon whiskey. *Id.* at 3:23–25. The distillery and whiskey have received over 50 awards, including Distiller and Distillery of the Year, and Best Straight Bourbon and Double Gold Medal awards. Sazerac Business Record (Hadid Confidential Decl. Ex. L; Dkt. No. 70-7[placeholder]; Dkt. No. 70-8[under seal]). Sazerac "capitalized on BUFFALO TRACE's accolades," Opp'n at 4, by investing in advertising, and sales of the whiskey grew from 16,000 cases in 2006 to over 3 million bottles in 2016. Comstock Dep. at 134:22–24; 427:19–22 (Hadid Confidential Decl. Ex. V; Dkt. No. 72-4[redacted]; Dkt. No. 72-5[under seal]).

Sazerac has registered eight federal trademarks related to the BUFFALO TRACE Trade

---

[1] Fetzer filed an administrative motion to file under seal portions of exhibits attached to its motion for summary judgment, including excerpts from the depositions of Kris Comstock (Ex. A) and Steve Wyant (Ex. I), as well as excerpts from a study produced by Sazerac (Ex. R). *See* Administrative Mot. (Dkt. No. 64). According to Fetzer's declaration in support of sealing, the material was designated by plaintiffs as confidential or highly confidential under the Protective Order. Disharoon Decl. ISO Administrative Mot. ¶ 4 (Dkt. No. 64-1). Under the local rules, Sazerac was required to submit a declaration within four days of the motion, "establishing that all of the designated material is sealable." Civil Local R. 79-5(e)(1). It did not do so, but filed an administrative motion to file under seal documents attached to its opposition, two of which include excerpts from the same depositions attached to Fetzer's motion. *See* Pl.'s Administrative Mot. to File Under Seal (Dkt. No. 70). In its motion, Sazerac cited the incorrect legal standard. *See id.* at 1. It is directed to file a declaration within four days of the date of this Order establishing compelling reasons to seal the information it has designated Confidential or Highly Confidential. *See Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006)("The 'compelling reasons' standard is invoked even if the dispositive motion, or its attachments, were previously filed under seal or protective order."). Fetzer filed a declaration in support of sealing eight of the 22 exhibits attached to Sazerac's opposition that it had previously designated Confidential or Highly Confidential. Disharoon Decl. ISO Sealing Confidential Documents Lodged by Sazerac ¶ 3 (Dkt. No. 77). Fetzer has narrowly tailored its request and demonstrated compelling reasons for sealing the eight exhibits because they contain trade secrets and specific business plans that would give competitors an advantage if made public. *See Kamakana*, 447 F.3d at 1179. I will delay ruling on Sazerac's administrative motion to give it an opportunity to establish compelling reasons for sealing its designated confidential information.

Dress and Buffalo Logos:

> • Buffalo Logo, U.S. Reg. No. 2,601,650, issued July 30, 2002, for "bourbon" and related marketing goods;
> • Buffalo Outline Logo, U.S. Reg. No. 2,516,318, issued December 11, 2001, for related marketing goods;
> • Buffalo Ripped Label Design, U.S. Reg. No. 2,476,423, issued August 7, 2001, for "bourbon";
> • BUFFALO TRACE And Design, U.S. Reg. No. 2,622,735, issued September 24, 2002, for "bourbon" and related marketing goods;
> • BUFFALO TRACE, U.S. Reg. No. 2,294,792, issued November 23, 1999, for "bourbon";
> • BUFFALO TRACE, U.S. Reg. No. 4,859,200, issued November 24, 2015, for "distilled spirits;"
> • BUFFALO TRACE DISTILLERY WHITE DOG, U.S. Reg. No. 3,835,562, issued August 17, 2010, for "whiskey;" and
> • WHITE BUFFALO, U.S. Reg. No. 4,215,557, issued September 25, 2012, for "vodka."

*See* Registrations (Hadid Decl. Ex. C; Dkt. No. 76-4). It licenses use of the Buffalo Trace trademarks on products such as barrel heads, candles, and candies. Comstock Dep. at 196:13–16; *see also* Wyant Dep. at 188:19–22; 191:16–23 (Confidential Hadid Decl. Ex. W; Dkt. No. 72-6[redacted]; Dkt. No. 72-7[under seal]); Licensing and Coexistence Agreements (Confidential Hadid Decl. Exs. R, S, T, U; Dkt. Nos. 71-10, 71-12, 72-1, 72-3[all under seal]).

### B.    Fetzer's 1000 Stories Wine

In 2011, Fetzer's Chief Executive Officer, Giancarlo Bianchetti, arrived in the United States and noticed a trend of American pride that he labeled "Americana." Bianchetti Dep. at 22:10–17 (Disharoon Decl. Ex. C; Dkt. No. 63-6). He also saw an opportunity for a wine brand specifically targeting men. *Id*. at 22:2–3. In late 2013, he read a Smithsonian Magazine article entitled "101 Objects that Made America," one of which was the buffalo, and thought the image embodied the concepts of the "male trend" and "Americana" swelling in the country. *Id*. at 22:23–23:8; 25:15–27:3; *see also* Affinity Creative Group Document (Confidential Hadid Decl. Ex. VV; Dkt. No. 75-13[under seal]). He decided it was the "perfect icon" for a new wine brand. Bianchetti Dep. at 28:16–24. He says that he had not heard of Sazerac or its Buffalo Trace Bourbon Whiskey until after the lawsuit. *Id*. at 21:2–16.

As Fetzer proceeded with plans for its new wine brand, Rodrigo Maturana, vice-president of marketing, sought inspiration from other products tapping into the "All-American" spirit.

Maturana Dep. at 37:25; 55:8–10; 56:20–21 (Disharoon Decl. Ex. D; Dkt. No. 63-7). He does not recall specifically looking at beverage products, and he denies pre-lawsuit knowledge of Sazerac and its Buffalo Trace whiskey. *Id.* at 56:16–21, 156:24–157:6. Fetzer retained Affinity Creative Group to assist in the brand development and design. *Id.* at 59:4–17. The marketing team eventually settled on the name "1000 Stories," which derived from playwright David Mamet's depiction of the American buffalo, symbol of the West, telling a thousand stories, "whether roaming free or stuffed." *Id.* at 93:23–95:11.

The team decided that the 1000 Stories brand was going to target the same demographic as the American bourbon consumer because that aligned with the intended all-American, male-oriented concept.[2] *Id.* at 121:23–122:1; *see also id.* at 134:15–23 (Confidential Hadid Decl. Ex. X; Dkt. No. 72-9[under seal]); "1000 Stories Shoot" Email (*Id.* Ex. Z; Dkt. No. 72-13[under seal]). It decided to age the wine in bourbon barrels to aid in targeting male consumers.[3] It chose to prominently include the text "Bourbon Barrel Aged" on the label, in part to differentiate it on the market. Devries Dep. at 77:3–78:4 (Disharoon Decl. Ex. F; Dkt. No. 63-9); Rice Dep. at 93:4–12 (Hadid Decl. Ex. XX; Dkt. No. 76-14); *see also* Fetzer Marketing Document (Confidential Hadid Decl. Ex. EE; Dkt. No. 73-9); Marketing Email (Confidential Hadid Decl. Ex. WW; Dkt. No. 75-15[under seal]); 2016 Go to Market Plan (Confidential Hadid Decl. Ex. DD; Dkt. No. 73-7[under seal]). Its marketing materials note that the wine is aged in "old bourbon barrels from famed distilleries such as Heaven Hill and Four Roses." Fetzer Marketing Document (Confidential Hadid Decl. Ex. EE; Dkt. No. 73-9). And it advertised its 1000 Stories wine in bourbon-focused magazines, including Whiskey Advocate and Bourbon review, and promoted the product at events aimed at bourbon drinkers. *E.g.*, Whiskey Advocate, Fall 2015 edition (Hadid Decl. Ex. D; Dkt. No. 76-5); Bourbon Review (*Id.* Ex. E; Dkt. No. 76-6); *see also* Bourbon Classic Sponsor Ticket Form (Confidential Decl. Ex. FF; Dkt. No. 73-11[under seal]); Email

---

[2] According to Fetzer, the idea came from Affinity. Maturana Dep. at 122:6–8, 19–23.

[3] Fetzer used bourbon barrels to age wine as early as the 1980s, Bell Decl. ¶ 2 (Dkt. No. 63-1), saw it as an "element" of targeting male consumers, and recognized that bourbon barrel aged beers were "hot in the market." Devries Dep. at 77:24–78:4.

Exchange Re: Bourbon Classic (*Id.* Ex. GG; Dkt. No. 73-13[under seal]); Email Exchange Re: Bourbon Review Ad (*Id.* Ex. HH; Dkt. No. 74-1[under seal]); Email Exchange Re: Whiskey Advocate (Confidential Hadid Decl. Ex. II; Dkt. No. 74-3[under seal]). In its internal documents, it mentions a goal to target Sazerac's consumers in particular. Fetzer Innovations PP (Confidential Hadid Decl. Ex. KK; Dkt. No. 74-7[under seal]). It even proposed a sangria recipe combining its 1000 Stories wine with Sazerac's Buffalo Trace Bourbon. Email Exchange (Confidential Hadid Decl. Ex. MM; Dkt. No. 74-11[under seal]).

### C. Expert Reports

Sazerac hired a market research firm to "design and conduct a study that would measure the extent, if any, to which Fetzer's use of the buffalo design trade dress in connection with red zinfandel wine is or is not likely to cause confusion among prospective purchasers of red zinfandel wine." Johnson Survey ¶ 5 (Hadid Decl. Ex. H; Dkt. No. 76-9). According to the Johnson Survey, 46 percent of respondents believed that the 1000 Stories red zinfandel came from the same company or had a business relationship with the company that makes Buffalo Trace. Johnson Survey ¶¶ 30–31, 33–34.[4]

Sazerac also submitted an expert report from alcoholic beverage industry expert C. Drew DeSarno, who offered the opinion that "beverage-alcohol companies regularly capitalize upon and expand brand equity of their trademarks across alcoholic beverage categories[,]" which leads consumers to associate "similar brand imagery and logos on brands in different alcoholic beverage categories" as products from the same company. Desarno Report at 25 (Hadid Decl. Ex. I, Dkt. No. 76-10). He further opined that "Fetzer is trading on the goodwill developed by Sazerac for Buffalo Trace Bourbon and consumers would likely believe Buffalo Trace is either selling or

---

[4] Fetzer objects to admission of the Johnson survey on grounds that it is irrelevant and offers an improper expert opinion. Reply at 1–2 (Dkt. No. 78). Its relevance argument tracks its contention that the survey is neither reliable nor helpful because it "improperly forced awareness of Buffalo Trace for every respondent," and asked "blatantly leading" questions that "improperly utilize[d] the word 'bourbon.'" *Id.* at 2. By doing so, Fetzer argues, the Johnson Survey "simply test[ed] whether consumers could match the only two products that shared the highlighted and non-protectable feature – the term 'bourbon' – as opposed to reliably predicting any real world confusion." *Id.* at 3. The Johnson Survey, and Fetzer's objection, are discussed *infra*.

endorsing Fetzer's 1000 Stories brand of wine." *Id*. at 26 (capitalization omitted).

## II. PROCEDURAL BACKGROUND

Sazerac became aware of Fetzer's 1000 Stories brand through a Certificate of Label Approval ("COLA") filed with the United States Alcohol and Tobacco Tax and Trade Bureau. Fetzer's Response to Interrogatories at 5:11–15 (Hadid Decl. Ex. A, F; Dkt. Nos. 76-2, 76-7).[5] It "sent Fetzer a letter requesting that Fetzer re-brand and refrain from the use of buffalo imagery on its alcoholic beverage products." Opp'n at 6; *see* 2/26/15 Sazerac Letter to Fetzer (Dkt. No. 76-8). It reasoned that "the 1000 Stories Buffalo Logo creates a likelihood of consumer confusion given that (1) [Fetzer's] logo uses a depiction of a buffalo similar to the Buffalo Trace buffalo logos…; (2) [Fetzer's] wine is advertised as having been aged in used bourbon barrel; (3) [Fetzer is] using [its] logo in connection with a related alcoholic beverage; and (4) [Fetzer's] product is likely to be sold and marketed through the same channels that Sazerac uses for its Buffalo Trace products." 2/26/15 Letter at 1–2.

Fetzer continued to use the buffalo imagery on its 1000 Stories brand, and on October 6, 2015, Sazerac filed a complaint for (1) trademark infringement under 15 U.S.C. § 1114, Compl. ¶¶ 33–39; (2) federal unfair competition under 15 U.S.C. § 1125(a), *id*. ¶¶ 40–43; (3) federal trade dress infringement under 15 U.S.C. § 1125(a), *id*. ¶¶ 44–50; (4) common law trademark infringement, *id*. ¶¶ 51–55; and (5) unfair competition under California Business and Professional Code § 17200, *et seq*., *id*. ¶¶ 56–60. Compl. (Dkt. No. 1). On March 3, 2016, Sazerac amended the complaint to add Sazerac Brands, LLC as a plaintiff. First Am. Compl. ("FAC")(Dkt. No. 36). On February 16, 2017, Fetzer moved for summary judgment or partial summary judgment "as to the entire Complaint, or, alternatively, that partial summary judgment be granted as to the first, second, third, fourth, and/or fifth causes of action, including as to each individual trademark infringement claim…, as well as on the claims for monetary damages, treble damages, and attorneys' fees[.]" Mot. at 1 (Dkt. No. 63[redacted]; Dkt. No. 64-8[under seal]).

---

[5] The timing of Sazerac's application, Fetzer's awareness of the 1000 Stories brand and subsequent letter to Sazerac is somewhat unclear. The date of application is "04/01/2015," Dkt. No. 76-7, but Fetzer's letter is dated February 26, 2015. *See* 2/26/15 Sazerac Letter to Fetzer (Dkt. No. 76-8).

**LEGAL STANDARD**

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial." *Id.* The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby,* 477 U.S. 242, 257 (1986).

On summary judgment, the Court draws all reasonable factual inferences in favor of the non-movant. *Id.* at 255. In deciding a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir. 1979).

**DISCUSSION**

Fetzer's main contention is that Sazerac's claims necessarily depend on it asserting rights in the generic term "bourbon," and since it cannot do that, its entire complaint must be dismissed as a matter of law. It also argues that the claims must fail because Sazerac has presented no evidence of consumer confusion. Mot. at 2. In the alternative, it argues for partial summary judgment because Sazerac's "case is based on a combination of elements on the 1000 Stories label[,]" there is no evidence of misbranding, no showing of secondary meaning, no evidence to support the monetary and treble damages claim, and no showing that this is an exceptional case justifying the award of attorneys' fees. *Id*. at 2–3.

# I.    SAZERAC'S TRADEMARKS[6]

Sazerac's causes of action for federal trademark infringement under the Lanham Act, 15 U.S.C. § 1114, common law trademark infringement, and unfair competition are subject to the same "ultimate test" of "whether the public is likely to be deceived or confused by the similarity of the marks." *New W. Corp. v. NYM Co. of California*, 595 F.2d 1194, 1201 (9th Cir. 1979). "Likelihood of confusion exists when consumers are likely to assume that a product or service is associated with a source other than its actual source because of similarities between the two sources' marks or marketing techniques." *Shakey's Inc. v. Covalt*, 704 F.2d 426, 431 (9th Cir. 1983). Courts look to the following factors,

> [S]imilarities between the protected and the allegedly infringing marks, the class of goods in question and the corresponding degree of care likely to be exercised by purchasers in selecting a product, the marketing channels, the intent of the alleged infringer, evidence of actual confusion, and the fame of the prior mark.

*Id.* (footnote omitted). A party need only show a likelihood of confusion and "actual confusion is not necessary to a finding of likelihood of confusion."[7] *Id.* n.6.

Fetzer's first argument, that Sazerac improperly attempts to claim rights in the terms "bourbon" and "bourbon barrel aged," mischaracterizes Sazerac's allegations. Sazerac mentions these terms because they are relevant to the likelihood of confusion analysis of Sazerac's trade dress claim. *See infra* section II.B. Fetzer's next argument, that Sazerac's complaint "fail[s] to allege that any mark on the 1000 Stories bottle is a 'colorable imitation' of any mark on the Buffalo Trace bottle[,]" Mot. at 9, has more merit, at least with respect to some of Sazerac's marks.[8] Sazerac urges that "the Fetzer Buffalo Logo infringes Sazerac's registered trademarks,

---

[6] Fetzer does not dispute the validity of Sazerac's asserted marks. *See Tie Tech, Inc. v. Kinedyne Corp.,* 296 F.3d 778, 783 (9th Cir. 2002)("A necessary concomitant to proving infringement is, of course, having a valid trademark; there can be no infringement of an invalid mark.").

[7] The Ninth Circuit employs the eight-factor *Sleekcraft* test to determine a likelihood of confusion. *See Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999). The entire likelihood of confusion analysis is addressed *infra* section II.B, but for purposes of limiting the trademarks at issue, I discuss only the similarity of the marks.

[8] The Lanham Act prevents "any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods… [when] such use is likely to cause confusion… ." 15 U.S.C. § 1114.

including its Buffalo Logos and the BUFFALO TRACE word mark[,]" Opp'n at 10, but in defense of its allegations it points to only two lines of deposition testimony from its 30(b)(6) designee, Kris Comstock, who offered his opinion that "yes, I think there's a trademark infringement and potential confusion." *See id.* (citing Comstock Dep. at 30:12–13, Conf. Hadid Decl. Ex. V, Dkt. No. 72-4[redacted], Dkt. No. 72-5[under seal]).

In reviewing the marks and assessing the parties' position, I agree with Fetzer that the testimony and evidence suggests limiting the trademarks at issue. Sazerac offers no argument that its BUFFALO TRACE DISTILLERY WHITE DOG (U.S. Reg. No. 3,835,562) and WHITE BUFFALO (U.S. Reg. No. 4,215,557) marks are infringed, so there can be no genuine dispute over whether those marks are infringed. *See Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999)("Where the two marks are entirely dissimilar, there is no likelihood of confusion."). It lists the Buffalo Outline and Buffalo Ripped Label Design as elements of its trade dress, but offers no argument that those marks are separately infringed. To the extent that its complaint alleged separate infringement claims for the Buffalo Outline Logo (U.S. Reg. No. 2,516,318), the Buffalo Ripped Label Design (U.S. Reg. No. 2,476,423), the BUFFALO TRACE DISTILLERY WHITE DOG (U.S. Reg. No. 3,835,562), and the WHITE BUFFALO (U.S. Reg. No. 4,215,557) marks, Fetzer's motion is GRANTED.

But Sazerac contends that Fetzer's Buffalo Design is similar to its Buffalo Logos and, by way of the doctrine of equivalents, similar to Sazerac's BUFFALO TRACE word mark. Opp'n at 14–15. The Ninth Circuit has "developed certain detailed axioms" for courts analyzing the similarities of parties' marks: "first, the marks must be considered in their entirety and as they appear in the marketplace; second, similarity is adjudged in terms of appearance, sound, and meaning; and third, similarities are weighed more heavily than differences[.]" *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1206 (9th Cir. 2000)(citations omitted). Sazerac asserts that "[a] reasonable juror would likely conclude that the parties' respective logos are similar[,]" but provides no analysis comparing the buffalo logos. Notably, it devotes the majority of its

likelihood of confusion analysis to its trade *dress* claim, which may be a concession that there are no genuine disputes regarding its trade*mark* infringement claims. To highlight this point, Fetzer cites to testimony from Sazerac's 30(b)(6) designee suggesting that Sazerac's claims stem from Fetzer's use of a buffalo *in conjunction with* the phrase "bourbon barrel aged." *See* Reply at 6 (citing Comstock Dep. at 230:23–231:2, 234:3–7, 355:14–356:5 (Disharoon Decl. Ex. A; Dkt. No. 63-4[redacted]; Dkt. No. 64-2[under seal]). But other portions of Comstock's testimony focus on the alleged similarity between the buffalos. *See, e.g.*, Comstock Dep. at 230:20–21 ("I would argue that the buffalo is very, very similar to our buffalo.").

Sazerac separately argues that the doctrine of equivalents applies to its word mark such that "a jury could also find that Fetzer's depiction of a buffalo on its label conveys the same commercial impression as the word BUFFALO." Opp'n at 14. "It is established that where a mark comprises a representation of an animal or individual and another mark consists of the name of that animal or individual, such designations are to be regarded as legal equivalents in determining likelihood of confusion under the Trademark Act." *Squirrel Brand Co.*, 223 U.S.P.Q. (BNA) ¶ 154 (T.T.A.B. July 31, 1984).

I find that disputed facts exist concerning Sazerac's infringement claims for its large buffalo logo and BUFFALO TRACE word mark. *See, e.g.*, *Bridgestone Americas Tire Operations, LLC v. Federal Corp.*, 673 F.3d 1330, 1337 (Fed. Cir. 2012)("Exact identity is not necessary to generate confusion as to source of similarly-marked products."); *Playmakers, LLC v. ESPN, Inc.*, 297 F. Supp. 2d 1277, 69 U.S.P.Q.2d 1439 (W.D. Wash. 2003), *aff'd*, 376 F.3d 894, 71 U.S.P.Q.2d 1759 (9th Cir. 2004)("[W]hat is critical is the overall appearance of the mark as used in the marketplace, not a deconstructionist view of the different components of the marks."); *Penguin Books Ltd. v. Eberhard*, 48 U.S.P.Q.2d 1280 (T.T.A.B. Apr. 27, 1998)(finding "striking similarity" between applicant's penguin mark for computer programs and book publisher's penguin mark, even though facing different directions). Fetzer's motion is DENIED as to Sazerac's infringement claims for its Buffalo Logo (U.S. Reg. No. 2,601,650) and BUFFALO TRACE word marks (U.S. Reg. Nos. 2,622,735; 2,294,792; 4,859,200).

## II.    SAZERAC'S UNREGISTERED TRADE DRESS[9]

"In addition to protecting registered marks, the Lanham Act, in § 43(a), gives a producer a cause of action for the use by any person of 'any word, term, name, symbol, or device, or any combination thereof ... which ... is likely to cause confusion ... as to the origin, sponsorship, or approval of his or her goods....'" *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 209 (2000)(quoting 15 U.S.C. § 1125(a)). "Trade dress involves the total image of a product and may include features such as size, shape, color, color combinations, texture, or graphics[,]" and "protection is broader in scope than trademark protection, both because it protects aspects of packaging and product design that cannot be registered for trademark protection and because evaluation of trade dress infringement claims requires the court to focus on the plaintiff's entire selling image, rather than the narrower single facet of trademark." *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 613 (9th Cir. 1989). To prove its trade dress infringement claim, Sazerac must prove: "(1) the trade dress is inherently distinctive or has acquired distinctiveness through secondary meaning;[10] (2) there is a likelihood that the public will be confused by the infringing use; and (3) the trade dress is nonfunctional."[11] *Stephen W. Boney, Inc. v. Boney Servs., Inc.*, 127 F.3d 821, 828 (9th Cir. 1997).

---

[9] Sazerac alleges two causes of action under 15 U.S.C. § 1125(a): federal unfair competition and federal trade dress infringement. *See* Compl. ¶¶ 41–51. Fetzer moves for summary adjudication on the federal unfair competition cause of action (also called false designation of origin) on grounds that Sazerac has provided no evidence of "material misbranding." Mot. at 11–12 (citing legal standard from out-of-circuit cases). But in the Ninth Circuit, "[a] seller's adoption of a trade dress confusingly similar to a competitor's constitutes unfair competition that is actionable under section 43(a) of the Lanham Act." *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 613 (9th Cir. 1989). Sazerac does not rely on a "misbranding" theory, *see* Compl. ¶¶ 41–44, and it can pursue its claims based on infringement of *and* unfair competition regarding its unregistered trade dress. *See* 15 U.S.C. § 1125(a).

[10] "Nothing in § 43(a) explicitly requires a producer to show that its trade dress is distinctive, but courts have universally imposed that requirement, since without distinctiveness the trade dress would not 'cause confusion ... as to the origin, sponsorship, or approval of [the] goods,' as the section requires." *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 210 (2000).

[11] Sazerac appears to dispute Fetzer's contention that "Sazerac must prove its trade dress is non-functional." Opp'n at 10 n.1; *see* Mot. at 12 n.7. One of the elements of a trade dress infringement claim is that the trade dress is non-functional, so the burden necessarily falls on Sazerac. However, Fetzer has not argued that Sazerac's trade dress is functional.

United States District Court
Northern District of California

### A. Sazerac's BUFFALO TRACE Trade Dress

As a preliminary matter, I must dispel Fetzer's conviction that "Sazerac's entire case is predicated on the false premise that it can assert ownership over the word 'bourbon'." Mot. at 7. A party asserting a claim for trade dress infringement must clearly identify the elements of its asserted trade dress. *See Sleep Sci. Partners v. Lieberman*, No. 09-04200 CW, 2010 WL 1881770, at *3 (N.D. Cal. May 10, 2010)("A plaintiff should clearly articulate its claimed trade dress to give a defendant sufficient notice."). Sazerac did so, and chose not to list "bourbon" as an element. *See* FAC ¶ 14 (defining "BUFFALO TRACE Trade Dress"). Fetzer may insist that Sazerac chose not to include "bourbon" as part of its asserted trade dress because it *cannot*, but that does not mean that I *can* insert "bourbon" into Sazerac's trade dress when it has elected to exclude it. *See AM Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 825 (7th Cir. 2002)("DaimlerChrysler is entitled to define its trade dress, and the wearing of figurative blinders seems to be the only way to compare the similarity of the [trade dresses]."); *accord Rose Art Indus., Inc. v. Swanson*, 235 F.3d 165, 173 (3d Cir. 2000)("[T]he plaintiff in a trade dress action under section 43(a) of the Lanham Act is free to seek trade dress protection for whatever products or packaging it sees fit."). Sazerac's asserted trade dress consists of the elements it listed—no more and no less. Fetzer's use of the phrase "BOURBON BARREL AGED" is relevant only to the likelihood of confusion analysis.

### B. Distinctiveness

The parties dispute whether Sazerac must show secondary meaning, or whether its trade dress can be inherently distinctive. Mot. at 12; Opp'n at 10; Reply at 7. Sazerac relies on *Two Pesos, Inc. v. Taco Cabana, Inc.* to argue that a party's inherently distinctive trade dress is protected without proof of secondary meaning. 505 U.S. 763, 776 (1992). But Fetzer counters with *Wal-Mart Stores, Inc. v. Samara Brothers*, in which the court stated that *Two Pesos*'s does not apply to *product-design* trade dress claims because a design "is not inherently distinctive." 529 U.S. 205, 212 (2000). The *Wal-Mart* court recognized that distinguishing *Two Pesos* in this way "will force courts to draw difficult lines between product-design and product-packaging" cases, but decided "that the frequency and the difficulty of having to distinguish between product

design and product packaging will be much less than the frequency and the difficulty of having to decide when a product design is inherently distinctive." *Id*. at 215. It directed courts to "err on the side of caution and classify ambiguous trade dress as product design, thereby requiring secondary meaning." *Id*.

Despite Fetzer's protestations (and *Wal-Mart*'s cautionary warning), this is a product packaging case because "the very purpose of attaching [the Buffalo Trace label] to [the] product … is … to identify the source of the product." *See Wal-Mart*, 529 U.S. at 212. Even though the label "may attract an otherwise indifferent consumer's attention on a crowded store shelf—[its] predominant function remains source identification." *Id*. That conclusion follows from the gravamen of Sazerac's complaint—Fetzer's use of a buffalo sketch combined with its reference to "bourbon-barrel aged" causes confusion over the *source* of Fetzer's 1000 Stories Zinfandel. Moreover, the "design of the elements appearing on the Buffalo Trace product," Reply at 6, is not the design of the product (the bourbon) itself.[12] *See id*. at 213 ("Consumers are aware of the reality that, almost invariably, even the most unusual of product designs—such as a cocktail shaker shaped like a penguin—is intended not to identify the source, but to render the product itself more useful or more appealing."). In short, this is a product packaging case and Sazerac's trade dress claim can be proven through inherent distinctiveness *or* secondary meaning. *See Globefill Inc. v. Elements Spirits, Inc.*, No. 210CV02034CBMPLAX, 2013 WL 12109779, at *2 (C.D. Cal. Oct. 15, 2013)("Plaintiff's skull-shaped bottle is packaging, and the trade dress is not product design."); *Yankee Candle Co. v. Bridgewater Candle Co., LLC*, 259 F.3d 25, 41 (1st Cir. 2001)("Detachable labels are a classic case of product packaging, and therefore may be inherently

---

[12] The example provided by Justice Scalia in the *Wal-Mart* decision further proves the point:

> There will indeed be some hard cases at the margin: a classic glass Coca–Cola bottle, for instance, may constitute packaging for those consumers who drink the Coke and then discard the bottle, but may constitute the product itself for those consumers who are bottle collectors, or part of the product itself for those consumers who buy Coke in the classic glass bottle, rather than a can, because they think it more stylish to drink from the former.

*Wal-Mart*, 529 U.S. at 215. Here, Sazerac is not alleging that its bottle "constitute[s] the product itself[,]" so this must be a packaging case. *See id*.

13

distinctive."); *Moroccanoil, Inc. v. Marc Anthony Cosmetics, Inc.*, 57 F. Supp. 3d 1203, 1222 (C.D. Cal. 2014)("Moroccanoil's trade dress is inherently distinctive because, like a Tide bottle and colors, its function is identification.")

### 1. Sazerac's Trade Dress is Not Inherently Distinctive

Under the Lanham Act, "[t]he predominant test for inherent distinctiveness asks whether (1) the design or shape is a common, basic shape or design; (2) it was unique or unusual in a particular field; and (3) it was a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods which consumers view as mere ornamentation." *Mattel, Inc. v. MGA Entm't, Inc.*, 782 F. Supp. 2d 911, 1004 (C.D. Cal. 2011)(quotation marks omitted). "In other words, if the trade dress is of such an unusual design that a buyer will immediately rely on it to differentiate the source of the product, then it is inherently distinctive." *Id.* (quotation marks omitted). Courts must look at the trade dress as a whole in assessing its inherent distinctiveness. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1259 (9th Cir. 2001).

Sazerac asserts its BUFFALO TRACE trade dress is inherently distinctive due to the unique combination of design elements—the "distinctive 'Buffalo Ripped Logo,' the 'Buffalo Outline' that appears on the neck label of its bottles, and white and gold lettering."[13] While consumers could come to rely on the Buffalo Trace trade dress to identify its source, Sazerac submitted no evidence that they do. Moreover, any presumed impression necessarily occurs over time, and not automatically or immediately, which suggests a showing of secondary meaning, not inherent distinctiveness. *Wal-Mart*, 529 U.S. at 212. A finding of inherent distinctiveness in Sazerac's trade dress would equate to a finding that an ordinary consumer necessarily conjures Sazerac's Buffalo Trace brand when presented with an American buffalo on an alcoholic beverage container. *See Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 32 (2d Cir. 1995)("[J]ust as copyright law does not protect ideas but only their concrete expression, neither does trade dress law protect an idea, a concept, or a generalized type of appearance."). The more

---

[13] By labeling this a product-design case, Fetzer avoids the issue of inherent distinctiveness and dives into a discussion of secondary meaning.

prudent course of action is to proceed to an analysis of whether Sazerac's Buffalo Trace trade dress has acquired distinctiveness through secondary meaning. *See Wal-Mart*, 529 U.S. at 211.

### 2. Secondary Meaning

"To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n.11 (1982). The Ninth Circuit defines secondary meaning as "the mental association by a substantial segment of consumers and potential consumers between the alleged mark and a single source of the product." *Levi Strauss & Co. v. Blue Bell, Inc.,* 778 F.2d 1352, 1354 (9th Cir. 1985). Consumers need not be able to identify the source of the product by name. *See Two Pesos*, 505 U.S. at 769–770. In determining whether a plaintiff's trade dress has acquired secondary meaning, courts consider the following factors: "direct consumer testimony; survey evidence; exclusivity, manner, and length of use of a mark; amount and manner of advertising; amount of sales and number of customers; established place in the market; and proof of intentional copying by the defendant." *Filipino Yellow Pages, Inc. v. Asian Journal Publications, Inc.*, 198 F.3d 1143, 1151 (9th Cir. 1999). "The question of secondary meaning is one of fact." *Levi Strauss*, 778 F.2d at 1355. Sazerac does not offer much evidence to establish secondary meaning of its marks and dress, *see* Opp'n at 12, but the evidence is sufficient to create a disputed issue of fact concerning secondary meaning.

### i. Consumer Testimony, Survey Evidence, Amount and Manner of Advertising, Amount of Sales and Number of Customers, and Established Place in the Market

Fetzer insists that "Sazerac produced nothing in discovery to suggest that consumers mentally recognize a buffalo image in the marketplace as associated with Sazerac and/or Buffalo Trace." Mot. at 14. It highlights Sazerac's own survey expert testimony indicating that he had to design the study the way he did because Buffalo Trace is "certainly not a well-known brand." Johnson Dep. at 65:18–20 (Disharoon Decl. Ex. N; Dkt. No. 63-18). Relatedly, Fetzer argues that Sazerac fails to demonstrate that Buffalo Trace's sales are tied to its trade dress's purported secondary meaning and it "has no evidence that a single consumer of 1000 Stories wine is even

15

aware of Buffalo Trace bourbon." Mot. at 15–16.

Sazerac ignores these arguments and cites to its "thousands of followers on major social media outlets." Opp'n at 12 (citing Interrogatory Response at 4:15–28). Buffalo Trace's "thousands of followers" and significant sales may be attributable to its award-winning bourbon alone, which would not necessarily suggest associating secondary meaning to its trade dress or marks. But these indicators of success may also have led consumers to associate Buffalo Trace's buffalo (or similar looking buffalo) and trade dress with a single source. *See Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 824 (9th Cir. 1993)("While evidence of a manufacturer's sales, advertising and promotional activities may be relevant in determining secondary meaning, the true test of secondary meaning is the effectiveness of this effort to create it."). Sazerac has at least demonstrated the disputed nature of these factors.

### ii. Exclusivity, Manner, and Length of Use of a Mark

Fetzer points to the use of a buffalo on several other alcohol beverage products to demonstrate that "Sazerac's use of a buffalo has been anything but exclusive[,]" and it underscores its position by identifying the "national heritage and history surrounding the buffalo." Mot. at 14–15. Some—but not all—of the products identified by Fetzer are the result of co-existence agreements between Sazerac and other companies. Comstock Dep. at 253:3–254:10, 263:4–264:15, 328:1–12, 340:12–21 (Disharoon Decl. ISO Admin. Mot. Ex. A.1; Dkt. No. 64-2[under seal]). But simply pointing to the fact that other alcoholic beverages use *a* buffalo may be irrelevant to the exclusivity of Sazerac's *particular* buffalo mark(s). The analysis depends on the particular buffalo image at issue.

### iii. Proof of Intentional Copying

Since Sazerac does not accuse Fetzer of intentional copying, this factor has no bearing on the analysis. *See* Sazerac Responses 26–27 (Disharoon Decl. Ex. K; Dkt. No. 63-14).

In sum, there is a dispute over two of the three factors to establish secondary meaning. This issue should be determined by the factfinder.

### C. Likelihood of Confusion

"[T]he core element of trademark infringement [likelihood of confusion] exists when

16

consumers are likely to assume that a product or service is associated with a source other than its

actual source because of similarities between the two sources marks or marketing techniques."

*Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 825 (9th Cir. 1993)(quotation marks

omitted).  Sazerac must demonstrate a likelihood of confusion to succeed on each of its claims.

*Brookfield Commc'ns, Inc*, 174 F.3d at 1046-47, n.8.

The Ninth Circuit employs the *Sleekcraft* factors to "guide the [likelihood of confusion]

inquiry."  *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025,

1030 (9th Cir. 2010).  They are,

> (1) the similarity of the marks; (2) the strength of the plaintiff's
> mark; (3) the proximity or relatedness of the goods or services; (4)
> the defendant's intent in selecting the mark; (5) evidence of actual
> confusion; (6) the marketing channels used; (7) the likelihood of
> expansion into other markets; and (8) the degree of care likely to be
> exercised by purchasers of the defendant's product.

*Id*.  Both parties dedicate significant portions of their briefing to demonstrating or debunking the

likelihood of confusion, which suggests that "[t]his case is yet another example of the wisdom of

the well-established principle that because of the intensely factual nature of trademark disputes,

summary judgment is generally disfavored in the trademark arena."  *Id*. at 1031 (quotation marks

and citation omitted).  As in *Fortune Dynamic*, I am confident that the question of consumers'

confusion is "close enough that it should be answered as a matter of fact by a jury, not as a matter

of law by a court."  *Id*.  Nonetheless, I will apply the *Sleekcraft* factors as "a guide to decision-

making, intended to channel the analytical process but not dictate any result."  *Entrepreneur*

*Media, Inc. v. Smith*, 279 F.3d 1135, 1141 (9th Cir. 2002)(internal quotation marks and citation

omitted).

## 1.    Similarity of the Marks and Dress

"Three general principles help determine whether marks are similar.  First, similarity is best

adjudged by appearance, sound, and meaning.  Second, the marks must be considered in their

entirety and as they appear in the marketplace.  Third, similarities are weighed more heavily than

differences."  *Fortune Dynamic*, 618 F.3d at 1032 (quotation marks and citations omitted).

Sazerac asserts infringement based on its Buffalo logos, BUFFALO TRACE word mark,

and BUFFALO TRACE trade dress. Opp'n at 14. Fetzer identifies specific distinctions between the buffalo marks, such as color, directional stance, and style, as well as other variations in the product packaging, such as bottle shape, glass color, capsule color, shape and color of the labels, product type and geographic origin to insist that "[n]o reasonable jury could conclude that the 1000 Stories buffalo is confusingly similar to the Buffalo Trace buffalo… ." Mot. at 18. While the differences are undeniable, the similarities are recognizable and Fetzer's citation of various cases does not persuade me otherwise. Both marks depict a sketched buffalo in neutral tones. As for the labels, Sazerac points out that "both display images of a buffalo on the front of the label and a separate, smaller buffalo image on the neck of the bottle; and both use gold and white lettering." Opp'n at 15. There are enough similarities to show a genuine dispute.

While Fetzer points to the prominence of its mark as a distinguishing characteristic, this case is not one where confusion is necessarily "avoided by the context in which the marks are presented." *Skechers U.S.A., Inc. v. Vans, Inc.*, 2007 WL 4181677, at *6 (C.D. Cal. Nov. 20, 2007). Due to the nature of Sazerac's claims—that Fetzer's buffalo logo and trade dress is likely to lead to confusion regarding a false *affiliation*—the prominence of Fetzer's own mark is irrelevant to the analysis. *Cf. Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1045–46 (2d Cir. 1992)("The district court found that the two trade dresses were strongly similar. After examining the two trade dresses, we conclude that, although they share many similar elements, the prominence of the trade names on the two packages weighs heavily against a finding of consumer confusion resulting from the overall look of the packaging.")

### 2.    Proximity or Relatedness of the Goods

"For related goods, the danger presented is that the public will mistakenly assume there is an association between the producers of the related goods, though no such association exists." *Sleekcraft Boats*, 599 F.2d at 350. "The more likely the public is to make such an association, the less similarity in the marks is requisite to a finding of likelihood of confusion." *Id.*

Fetzer states that "the two products are entirely different types of alcohols, with different uses and location within stores" to argue that they are "unrelated in the real world marketplace." Mot. at 19–20. It cites to cases suggesting that different wine varietals indicates a lack of

18

competitive proximity. *Id.*; *see Constellation Brands, Inc. v. Arbor Hill Assocs., Inc.*, 535 F. Supp. 2d 347, 366 (W.D.N.Y. 2008); *Banfi Prod. Corp. v. Kendall-Jackson Winery, Ltd.*, 74 F. Supp. 2d 188, 197 (E.D.N.Y. 1999); *Vigneron Partners, LLC v. Woop Woop Wines Pty Ltd.*, No., C 06-00527 JF, 2006 WL 1214859, at *5 (N.D. Cal. May 5, 2006).

Those cases say nothing about the relatedness between spirits and other alcoholic beverages. By arguing that "[t]here is no evidence that [the products] are 'related' in any way," Mot. at 20, Fetzer overlooks the precedent establishing the relatedness between spirits and other alcoholic beverages. *E.g.*, *Monarch Wine Co., Inc. v. Hood River Distillers, Inc.*, 196 U.S.P.Q. 855 (T.T.A.B. 1977)("[W]e believe that a prospective purchaser of an alcoholic beverage upon entering and browsing through the various alcoholic products located or displayed on the various shelves or counters in retail liquor establishments would, upon encountering a whiskey, rum, brandy or vodka identified by the [mark] and then continuing on his jaunt to another counter or section of the same store and seeing a wine or champagne sold under the identical mark, [would] be likely to believe that both products originated with the same producer."). Fetzer also seems to ignore its own advertising and marketing strategy that explicitly drew a connection between its 1000 Stories wine and bourbon drinkers. Once again, Fetzer misrepresents the nature of Sazerac's claims to reach its conclusion that the products are unrelated.[14]

### 3. Strength of the Mark

"The 'strength' of a trademark is evaluated both in terms of its conceptual strength and its commercial strength." *Stark v. Diageo Chateau & Estate Wines Co.*, 907 F. Supp. 2d 1042, 1058 (N.D. Cal. 2012). "Marks can be conceptually classified along a spectrum of generally increasing inherent distinctiveness as generic, descriptive, suggestive, arbitrary, or fanciful." *Brookfield Communs., Inc*, 174 F.3d at 1058.[15]

The strength of a mark is determined through the 'imagination test,'

---

[14] Fetzer's evidence suggesting that "the two products at issue have no competitive or commercial impact on each other" is irrelevant to the analysis.

[15] *Wal-Mart* suggests that the *Abercrombie* spectrum is limited to word marks. *Wal-Mart*, 529 U.S. at 210.

> in which a court asks how much imagination a consumer must use to associate a given mark with the goods or services it identifies . . . the more imagination required, the stronger the mark is; and the 'need test,' which asks to what extent a mark is actually needed by competitors to identify their goods or services.

*Earthquake Sound Corp. v. Bumper Indus.*, 352 F.3d 1210, 1221 n.4 (9th Cir. 2003)(quotation marks and citation omitted).

Fetzer does not address the conceptual strength of Sazerac's marks, but it cannot legitimately argue that a buffalo necessarily calls to mind bourbon or bourbon-related products. The conceptual strength of Sazerac's marks is undisputed. Further, Sazerac produced evidence of the commercial strength of its marks through the number of sales, years of continuous use, advertising expenditures, and social media following. Opp'n at 18; *see Sutter Home Winery, Inc. v. Madrona Vineyards, L.P.*, No. C 05-0587 MHP, 2005 U.S. Dist. LEXIS 4581, at *30 (N.D. Cal. Mar. 23, 2005)(finding both commercial strength in the years of continuous use, the numbers of cases sold, and promotional efforts).

### 4. Defendant's Intent in Selecting the Mark

"The law has long been established that if an infringer 'adopts his designation with the intent of deriving benefit from the reputation of the trade-mark or trade name, its intent may be sufficient to justify the inference that there are confusing similarities.'" *Pac. Telesis Grp. v. Int'l Telesis Commc'ns*, 994 F.2d 1364, 1369 (9th Cir. 1993). Fetzer relies on its CEO's testimony that he was inspired by the National Geographic article and he and others had no knowledge of Sazerac and its Buffalo Trace brand prior to this lawsuit. But the credibility of that testimony is undermined by Fetzer's own documents, which disclose a marketing strategy that included targeting Sazerac accounts for sales of 1000 Stories wine and potential cross promotions with Buffalo Trace. While it is possible that Fetzer could have selected the 1000 Stories mark without knowledge of Sazerac's Buffalo Trace brand, the facts at least suggest a genuine dispute as to Fetzer's intent considering Buffalo Trace's accolades in the bourbon world and Fetzer's admission that it aimed to target bourbon drinkers.

### 5. Evidence of Actual Confusion

Evidence of actual confusion is persuasive, but courts have recognized the difficulty in

proving it and found that failure to show it is not dispositive. *Sleekcraft*, 599 F.2d at 352–53. "Survey evidence may establish actual confusion." *Fortune Dynamic*, 618 F.3d at 1035.

Fetzer highlights the lack of actual confusion over the course of 1000 Stories' three-year existence despite "so many bottle co-existing in the marketplace[] and so many opportunities for consumers to report potential confusion." Mot. at 22. And Sazerac responded with its Johnson Survey, to which Fetzer objected. While I agree with Fetzer that the Johnson Survey may suffer from some "technical inadequacies," those "bear on the weight of the evidence, not its admissibility." *Keith v. Volpe*, 858 F.2d 467, 480 (9th Cir. 1988); *see also Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997)("Challenges to survey methodology go to the weight given the survey, not its admissibility."). Fetzer is entitled to offer its expert's opinions in rebuttal and a jury will be tasked with weighing their respective credibility. The Johnson Survey demonstrates a genuine issue whether Fetzer's trade dress was likely to confuse consumers. *See Fortune Dynamic*, 618 F.3d at 1037.

### 6. The Marketing Channels Used

Under this factor, courts should "consider whether the predominant purchasers of the parties' goods are similar or different, and whether the parties' marketing approaches resemble one another." *Fiji Water Co., LLC v. Fiji Mineral Water USA, LLC*, 741 F. Supp. 2d 1165, 1180 (C.D. Cal. 2010)(quotation marks omitted).

Fetzer argues that there cannot be "substantial" overlap here because Sazerac admittedly does not do a lot of advertising. Mot. at 20–21. The case on which Fetzer relied for this proposition, *Entrepreneur Media*, discussed the parties' use of the internet for marketing. 279 F.3d at 1151. That is not at all akin to this case, where the parties advertise in the very same magazines and market at the same events. *See* Fall 2015 Whiskey Advocate (Hadid Decl. Ex. D; Dkt. No. 76-5); The Bourbon Review (*Id.* Ex. E; Dkt. No. 76-6); Fetzer Documents (Confidential Hadid Decl. Exs. FF – II; Dkt. Nos. 73-11, 73-13, 74-1, 74-3[all under seal]). Their marketing channel is the same.

### 7. The Likelihood of Expansion into other Markets

Neither party offered evidence that it intends to expand into the particular sub-category

occupied by the other, but "[t]he likelihood of expansion in product lines factor is relatively unimportant where two companies already compete to a significant extent." *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1060 (9th Cir. 1999). Although bourbon and wine producers may not be directly competing for the same consumers, they do occupy the same marketing and promotional space.

### 8. The Degree of Care Likely to be Exercised by Purchasers of the Defendant's Product

The "reasonably prudent consumer" is expected "to be more discerning—and less easily confused—when he is purchasing expensive items." *Brookfield Comm., Inc.*, 174 F.3d at 1060. Fetzer cites to *Star Industries* to support its contention that "[c]onsumers are smart and discerning, especially when purchasing high-quality alcohol products at these price points." Mot. at 21. But the *Star Industries* court found that "consumers would generally be expected to understand that Bacardi's use of the letter 'O' was intended to indicate orange flavor, and not a marketing or sponsorship arrangement with Star." *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 390 (2d Cir. 2005). The same cannot be said here, where the precise basis for Sazerac's allegations is that Fetzer's use of its buffalo mark paired with an association to bourbon is likely to mislead consumers to assume a marketing or sponsorship arrangement between Fetzer and Sazerac. Since Fetzer's buffalo does not convey a particular feature of its 1000 Stories product, as Bacardi's 'O' did, that case is not helpful.

Viewing the *Sleekcraft* factors as a whole clearly demonstrates a genuine dispute as to the likelihood of confusion.

## III. SAZERAC CANNOT RECOVER MONETARY DAMAGES

Fetzer contends that Sazerac cannot recover monetary damages because it did not disclose any expert to propound on a reasonable royalty, even though its initial disclosures said that it would, and it did not seek Fetzer's gross receipts to support restitutionary relief. Mot. at 23–24. Sazerac states that it is "unaware of any case law … for the proposition that an expert must be retained for damages to be recovered. Opp'n at 23. It points to its "licensing agreements with third parties, which will give the jury a basis for calculating the royalty Fetzer would have paid

had the parties entered into a license." *Id*. While the general proposition Sazerac relies on is correct, it ignores the source of Fetzer's grievance—the rules governing disclosure. *See* Fed. R. Civ. P. 26(a).

In its initial disclosures, Sazerac stated that it "intends to develop specific methodologies and calculations of the foregoing remedies [reasonable royalty and disgorgement of equitable share of profits] through expert testimony." Pl.'s Am. Disclosures at 4 (Disharoon Decl. Ex. S; Dkt. No. 63-22). It represented that it would disclose an expert to prove damages. It never amended this disclosure.[16] In fact, it did not disclose any damages calculation until shortly before the February 22, 2017 settlement conference, long after the close of discovery. *See* Civil Minutes from 4/4/17 Hr'g (Dkt. No. 79).

Fetzer justifiably relied on Sazerac's initial disclosures and would be prejudiced if Sazerac is permitted to establish damages through some other means. For example, while Sazerac produced some licensing agreements in discovery, Fetzer was not alerted to the need to serve third party subpoenas to discover the materiality of the agreements. It reasonably concluded that it could wait until Sazerac's expert report was disclosed and then address and rebut them with its own expert. When Sazerac did not identify an expert, Fetzer reasonably assumed that Sazerac would not be seeking damages. Sazerac's settlement conference damages calculation was not previously disclosed and is predicated on information Sazerac had but did not disclose at the time it provided its initial disclosures. Sazerac does not offer any excuse, let alone one establishing good cause, for its failure to disclose the calculations or amend its initial disclosures in a timely way. It is far too late in the game for Sazerac to change course without notice. I do not see how any prejudice could be remedied at this late stage. *See Use Techno Corp. v. Kenko USA, Inc.*, No. C-06-02754 EDL, 2007 WL 4169487 (N.D. Cal. Nov. 20, 2007)(granting defendant's motion for summary judgment based on plaintiff's failure to disclose damages).[17]

---

[16] If it planned to prove damages by some other means, it should have supplemented its disclosures under Fed. R. Civ. P. 26(e).

[17] In *Use Techno*, plaintiff failed to disclose any damages theory or computation. 2007 WL 4169487, at *3. The same is not true here.

## IV.     SAZERAC MAY BE ABLE TO RECOVER ATTORNEYS' FEES

Fetzer argues that this is not the type of "exceptional case" that justifies an award of attorneys' fees. Mot. at 24–25. "A trademark case is exceptional where the district court finds that the defendant acted maliciously, fraudulently, deliberately, or willfully." *Earthquake Sound Corp. v. Bumper Indus.*, 352 F.3d 1210, 1216 (9th Cir. 2003). "The issue is not *necessarily* one of bad faith[.]" *Id*. at 1218 (emphasis added). Since Sazerac would be entitled to recover attorneys' fees if a jury found that Fetzer acted "maliciously, fraudulently, deliberately, or willfully," Fetzer is not entitled to summary judgment.

### CONCLUSION

In accordance with the foregoing, Fetzer's motion is GRANTED IN PART concerning Sazerac's ability to recover monetary damages and its infringement claims for six of the trademarks, as discussed above, AND DENIED IN PART regarding the other two marks and the trade dress.

**IT IS SO ORDERED.**

Dated: April 27, 2017

William H. Orrick
United States District Judge