UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAZERAC COMPANY, INC., et al., | Case No.  3:15-cv-04618-WHO |
| Plaintiffs, | |
| v. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| FETZER VINEYARDS, INC., | |
| Defendant. | |

## INTRODUCTION

I conducted a bench trial from June 26-30, 2017 on plaintiff Sazerac Company, Inc.'s ("Sazerac") trademark and trade dress infringement case against Fetzer Vineyards ("Fetzer"), and heard closing argument on August 14, 2017.  In the final analysis, this case was not close.  Sazerac claimed that Fetzer's trade dress on its 1000 Stories red zinfandel wine infringed the trade dress of Sazerac's Buffalo Trace bourbon.  But it did not establish that Buffalo Trace bourbon's trade dress was similar to 1000 Stories wine's.  It did not establish that Fetzer intended to infringe at the creation of its product or in its marketing.  There was no evidence of actual confusion between the products.  Fetzer's expert's analysis using a modified Eveready survey was far superior to the two room survey employed by Sazerac's expert.  The primary point of alleged confusion, the buffalo depicted on each label, is used on numerous other alcoholic beverages.  Sazerac did not establish that Buffalo Trace acquired secondary meaning, and consideration of the *Sleekcraft* factors would also doom its claim.  At the conclusion of these Findings of Fact and Conclusions of Law, I will award Judgment to Fetzer.

United States District Court<br>Northern District of California

United States District Court
Northern District of California

### FINDINGS OF FACT

#### A.      The Parties

1.  Plaintiff Sazerac is an alcoholic beverage company.  It owns the Kentucky-based Buffalo Trace Distillery, the oldest continuously operating distillery in the United States.  Comstock Test. at 48:24-49:4, 50:8-10.  It produces over 350 different brands of alcoholic beverages, including more than 30 Canadian whiskeys, at least 12 blended whiskeys, about 10 rye whiskeys, around 40-50 vodkas, and about 15 bourbon brands produced at Buffalo Trace Distillery, including the product at issue here, Buffalo Trace bourbon.

2.  The name "Buffalo Trace" refers to the ancient buffalo trails where the distillery is located.  Comstock Test. at 183:25-184:4.  Buffalo Trace bourbon is the "namesake brand" of the distillery.  It was introduced in 1999.  Sazerac sold approximately 350,000 cases (or 4.2 million bottles) of Buffalo Trace bourbon in 2016.  Comstock Test. at 86:6-10.

3.  Sazerac owns the following relevant valid U.S. trademark registrations in connection with the Buffalo Trace brand: Buffalo Logo, U.S. Reg. No. 2,601,650, issued July 30, 2002, for "bourbon" and related marketing goods; Buffalo Outline Logo, U.S. Reg. No. 2,516,318, issued December 11, 2001, for related marketing goods; BUFFALO TRACE, U.S. Reg. No. 2,294,792, issued November 23, 1999, for "bourbon"; and BUFFALO TRACE, U.S. Reg. No. 4,859,200, issued November 24, 2015, for "distilled spirits;" Exhibits 50, 74, 77, and 78.  Because of the competitive landscape of the alcoholic beverage industry, and the corresponding need for brand assets to stand out on shelves and in the minds of consumers, control over the Buffalo Trace Marks is especially important to Sazerac. DeSarno Test. at 264:14-265:17; 277:10-279:15.

4.  Fetzer produced no evidence challenging the validity of Sazerac's trademark registrations.

5.  Defendant Fetzer sells wine.  Since 1993, it has launched 25 different brands.  In November 2014, it launched the "1000 Stories" brand, a red zinfandel that is the allegedly infringing product in this case.  Since that time, Fetzer has sold approximately 150,000 cases, and is pushing to sell at least 85,000 more through 2017.  At 12 bottles a case, that equates to 2.82 million bottles.  Bianchetti Test. at 383:2-20; Newman Test. at 843:9-16.  1000 Stories now represents roughly 3% of all red zinfandel sold: 337 million cases of table wine sold, Maturana

Test. at 819:10-14, of which approximately 5 million are red zinfandel, Bianchetti Test. at 381:11 [1.5% of the wine market is red zinfandel]); for 2017, Fetzer projects it will sell around 140,000 cases of 1000 Stories, or 2.8% of 5 million.  Bianchetti Test. at 383:19-22.

> ### B.       The Trade Dresses Are Not Similar

6.   The Buffalo Trace trade dress consists of the "Buffalo Ripped Label Design," the "Buffalo Outline Logo" that appears on the neck label of Sazerac's bottles, and white and gold lettering (the "Buffalo Trace Trade Dress", together with the BUFFALO TRACE mark and the BUFFALO Logo, the "Buffalo Trace Marks").  Comstock Test. at 71:1-8; Ex. 128.  Neither buffalos nor the phrase "Buffalo Trace" describe a quality or characteristic of Buffalo Trace bourbon, nor do they otherwise possess any connection to or association with bourbon.  Comstock Test. at 69:5-15. None of the elements of the Buffalo Trace Trade Dress have a descriptive connotation or association with bourbon.  Sazerac has used the same Buffalo Trace Trade Dress in commerce since 1999.  Comstock Test. at 71:9-15.

7.   However, although there are some similarities in the trade dresses of the Buffalo Trace bourbon and 1000 Stories bottles, they are minimal.  Both parties use a realistic sketched rendering of a buffalo on the label, in which the entire body of the animal is visible, and there are smaller buffalo outlines on the neck of the bottle, and white and gold lettering.  Comstock Test. at 71:1-8; Exs. 127, 128.  But the 1000 Stories label is black and the bottle has a red capsule; the Buffalo Trace label is a tannish color and the bottle has a green capsule.  The 1000 Stories buffalo icon faces left and is in profile; the Buffalo Trace buffalo is directed to the right and faces head-on. The 1000 Stories wine bottle is in a classic zinfandel bottle shape, and is made of darkly colored glass; the Buffalo Trace bourbon bottle is squat and clear (and reveals the brown bourbon within). The two labels prominently display two markedly different brand names – 1000 Stories and Buffalo Trace – and many other distinct words.  The only word that appears on each is "bourbon," and even that is depicted differently on each product; on 1000 Stories' label, it is part of the descriptive phrase "Bourbon Barrel Aged," whereas on Buffalo Trace's label, it is part of the descriptive phrase "Kentucky Straight Bourbon Whiskey" (and is less prominent than the larger

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

words "Buffalo Trace," and also less prominent than the words that begin and end that phrase, i.e., "Kentucky" and "Whiskey").  (E.g., Exhs. 127, 72 at pp. 2, 4.)

  **C.**  **There was No Evidence of Fetzer's Intent to Infringe in Creating 1000 Stories**

 8.  Fetzer is owned by Concha y Torro, a Chilean wine company.  In 2011, Concha y Torro appointed Giancarlo Bianchetti to serve as Fetzer's Chief Executive Officer.  At that time, Bianchetti relocated from Chile to California.  Bianchetti Test. at 368:17-369:8.  Also in 2011, Concha y Torro appointed Rodrigo Maturana to serve as Fetzer's marketing director (he subsequently became Fetzer's Vice President of Marketing).  Maturana also relocated from Chile to California in 2011.  Maturana Test. at 734:7-735:25.

 9.  After relocating to California, Bianchetti determined that an opportunity existed for Fetzer to develop a male-oriented wine brand.  (Among other things, Fetzer already had at least one wine brand, Little Black Dress, that was targeted to female wine drinkers.)  Bianchetti also noticed a trend of American pride that he called "Americana."  He decided that the company should develop a new brand around these two concepts: male-oriented and "Americana" themed.  Bianchetti Test. at 374:1- 376:6.

 10. In November 2013, Bianchetti read an article in the Smithsonian magazine entitled "101 Objects That Made America," and one of those "objects" was the American Buffalo.  Bianchetti decided that the buffalo was the perfect icon for the male-oriented and Americana-themed wine brand already under consideration, and selected the buffalo image with the intent of encapsulating a masculine, "Made in America" image for the new brand.  Bianchetti Test. at 377:16-379:12; Maturana Test. at 741:21-742:3.

 11. During the development of the 1000 Stories brand, Fetzer noted other products that were emphasizing the "Americana" theme, including Wrangler and Levi Jeans, Calvin Klein, Ralph Lauren, Budweiser, Cadillac, and Victoria's Secret, each of which had ads at the time that emphasized American pride.  Bianchetti Test. at 375:14-376:6; Maturana Test. at 739:4-13.

 12. In late 2013, Fetzer retained a brand development firm, Affinity Creative Group, to assist with the development of the new brand.  Fetzer informed Affinity that Fetzer wanted to create a new, male-oriented wine brand with a focus on American pride concepts and which featured the

4

image of a buffalo.  Maturana Test. at 743:21-746:19; Affinity Decl., Exh. 222, at ¶¶ 5-7 and Exh. 11 referenced therein.  After being retained, Affinity suggested that the brand be targeted to a demographic that included bourbon drinkers because that demographic coincided with the male and "Americana" themes that Fetzer was hoping to embody in the new brand.  Maturana Test. at 746:25-749:4; Affinity Decl, Exh. 222, at ¶ 6; Exh. 10.

13. In early December 2013, Affinity prepared several label mock-ups with different depictions of the buffalo icon for the brand.  Since this was before the decision was made to age the wine in bourbon barrels, none of the mock-ups use that term.  Affinity Decl., Exh. 222, at ¶¶ 8-9 and Exh. 9.

14. Affinity was tasked with designing the buffalo imagery, which it did with help from an illustrator.  Part of the inspiration for the buffalo image that was ultimately chosen for the 1000 Stories' label came from the buffalo nickel – which is also depicted in profile form and facing left. Fetzer approved the final version of the left-facing buffalo image that appears on the 1000 Stories label today, but did not design it or direct Affinity how to design it.  Affinity Decl., Exh. 222, at ¶ 11.

15. Also as part of its work, Affinity proposed several different names for the new brand, including 1000 Stories.  Affinity Decl., Exh. 222, at ¶ 12 and Exhs. 4, 5, and 129 referenced therein.  Fetzer ultimately chose the name "1000 Stories," taking it from the subtitle of the article in the Smithsonian Magazine that had served as the original inspiration for using the buffalo as the brand's icon, where the author wrote that the American Buffalo is a "symbol of the west [that] tells a thousand stories."  Affinity Decl., Exh. 222, at ¶ 13.

16. During discussions at Fetzer regarding the new brand, the decision was made to have it be a red zinfandel wine.  This was to further the "Americana" appeal of the new brand, because "if you really look for Americana, zinfandel is by far the best, well known American only grape." Bianchetti Test. at 380:21-25.  The decision to make the new brand a red zinfandel was viewed as "risky" by Fetzer, in part because red zinfandel comprises only 1.5 percent of the American wine market.  Bianchetti Test. at 380:21-381:21.  The idea to age the 1000 Stories wine in bourbon barrels was reached in early 2014.  This decision was based, in part, on the explanation from Bob

Blue, Fetzer's winemaker, that Fetzer had a history of having aged wine in bourbon barrels, and had done so at least as early as the 1980s.  Bianchetti Test. at 381:22- 383:1; Blue Test. at 690:23-691:7.

17. Before it goes into bourbon barrels, 1000 Stories red zinfandel wine is aged in stainless steel and/or wine barrels, the latter of which have a lighter "char" than bourbon barrels.  Blue Test. at 690:11-13, 706:10-23.  The red zinfandel wine for the 1000 Stories brand is then aged in a combination of new and used bourbon barrels.  A new bourbon barrel imparts a strong smoky characteristic to the wine, whereas a used bourbon barrel provides different characteristics due to the bourbon that was in the barrel previously and depending on how many times the barrel had been used in the past to age wine.  Blue Test. at 690:2-22.  Following the decision to age the 1000 Stories wine in bourbon barrels, Fetzer worked with Affinity to add the phrase "Bourbon Barrel Aged" to the 1000 Stories label.  Affinity Decl., Exh. 222, at ¶ 9 and Exh. 3 referenced therein.  Fetzer also includes the statement "small batch" on the 1000 Stories label, a phrase which is commonly used in connection with bourbon but not wine.  Comstock Test. at 97:19-98:5; Newman Test. at 863:25-864:5; Exs. 23.3, 127.

18. Working with Affinity, Fetzer considered several different labels, with various portrayals of a buffalo.  Also working with Affinity, Fetzer considered several different names for the new brand.  Ultimately, Fetzer selected four labels and three potential brand names to test to see which potential consumers viewed most favorably.  Fetzer retained a firm called Insights in Marketing to test the four selected label designs and three potential brand names; the testing, which occurred in April 2014, revealed that potential consumers preferred both the current label and the 1000 Stories brand name.  Maturana Test. at 767:4-15; Exh. 131.  Fetzer promoted the 1000 Stories brand as a melding of American beverages from each coast – red zinfandel from the West, and bourbon whiskey from the East – with the left-facing buffalo encapsulating the connection of the two in the same manner that pioneers moved East to West across the United States.  Blue Test. at 695:5-25; Newman Test. at 843:22-844:12; Exh. 133.

19. There was no evidence at trial that anyone involved  during the process of developing the 1000 Stories label considered or used in any way the Buffalo Trace bourbon label or trade dress.

United States District Court
Northern District of California

1  There was no evidence that the label was selected with any intent either to imitate Buffalo Trace

2  bourbon or confuse consumers as to a potential affiliation, association, sponsorship, or

3  endorsement between the two brands or companies.  Bianchetti Test. at 388:3-13, 452:12-14; Blue

4  Test. at 691:11-16; DeVries Test. at 726:3-12; Maturana Test. at 778:16-24; Newman Test. at

5  856:11-15; Affinity Decl., Exh. 222, at ¶¶ 14-15; Exh. 131.

6     20. The 1000 Stories bottle does not have the name "Fetzer" or "Fetzer Vineyards" anywhere

7  on it.  This is intentional, and done to make the wine brand appear as if it comes from a different

8  company than the Fetzer wine brand, which is marketed and sold at a much lower price point than

9  1000 Stories.  DeVries Test. at 716:10-717:11; Bianchetti Test. at 371:17-22.

**D.      The Evidence of Intent to Infringe after Product Launch Is Thin at Best**

**1.      The Cease and Desist Letter**

12     21. Sazerac points to several facts that purportedly show that Fetzer knew that it was

13  infringing and did so intentionally.  In January 2015, Brown-Forman, a company that produces

14  and owns several brands of wines and spirits, including bourbon, represented to Fetzer that it

15  would not partner with them to market 1000 Stories wine because the 1000 Stories buffalo

16  imagery called to mind Buffalo Trace bourbon.  Ex. 26.  After learning of Brown-Forman's

17  concern, Fetzer did nothing to assess the risk associated with the 1000 Stories logo and trade

18  dress.

19     22. A month later, on February 26, 2015, Sazerac sent Fetzer a letter requesting that Fetzer re-

20  brand and refrain from the use of buffalo imagery on its alcoholic beverage products.  Ex. 81. It

21  had first become aware of the 1000 STORIES brand and associated buffalo imagery through a

22  Certificate of Label Approval ("Fetzer's COLA") filed with the United States Alcohol and

23  Tobacco Tax and Trade Bureau in or around December 2014. Ex. 81.  Maturana sent Sazerac's

24  letter to Fetzer's headquarters in Chile to respond.  He noted, "Obviously we have no intention of

25  discontinuing our trademark." Ex. 220.

26     23. Concha y Toro performed an analysis of the claim asserted in the letter.  It noted, among

27  other things, that (1) "the use of the buffalo as an image is very widespread," (2) there were

28  several producers of alcoholic beverages who used buffalo imagery on their products, and (3)

United States District Court
Northern District of California

"bourbon is a type of whiskey (produced from corn), different from wine (produced from grapes) which allows for the co-existence of the products." Exhs. 220, 221; Bianchetti Test. at 471:7-473:18. Fetzer relied on this analysis both when it responded to Sazerac's letter and when Fetzer decided to continue to market the 1000 Stories brand. Bianchetti Test. at 468:19-474:9; DeVries Test. at 729:20-730:2; Exhs. 220-221.

24. Fetzer did not perform trademark clearance for the 1000 Stories buffalo logo or trade dress prior to its production. Whether that was prudent or not, it was consistent with its past practice. Fetzer has launched several other brands – Bel Arbor, Fetzer Mendo, Crimson Quartz, OneTwo Punch, and Beckon –since 2011. Maturana Test. at 738:2-9; 781:10-11. With respect to 1000 Stories, Maturana followed the same process he had used in the past (both while he was at Concha y Toro in Chile and at Fetzer) to first try to clear the brand name (in this case, "1000 Stories"), and after the product was introduced, to try to register the entire label. Maturana Test. at 779:15-781:20.

### 2.      Sales, Distribution and Marketing

25. Sazerac asserts that Fetzer adopted a marketing strategy of trying to confuse consumers into thinking that there was some relationship between 1000 Stories zinfandel and Buffalo Trace bourbon. Dr. Itamar Simonson, a professor of marketing at Stanford University and one of Fetzer's experts, testified that such a strategy "would be an example of the weakest marketing strategy" he could recall. Simonson explained, "It's one thing to say we're interested in targeting the consumer who is impressed by bourbon affiliation. That's perfectly fine. That's marketing strategy, you are targeting a particular customer or priority. That happens all the time. But basing a strategy on what is – what is clearly a false – would have been a false assumption, that somehow we can confuse people, and those people somehow would be confused, and because they are confused they would go and buy this wine, it just makes absolutely no sense. Absolutely no sense. It would have been a complete failure as a marketing strategy." Simonson Test. at 682:25-683:11.

26. Fetzer markets its wine as having been aged in bourbon barrel from "famed distilleries such as Heaven Hill and Four Roses." Blue Test. at 704:10-705:6; Exs. 23.3, 133, 239 at 144:12-145:23.

27. There are certain similarities in the marketing of the two products.  Alcoholic beverage sales in the United States are subject to a three-tier distribution system.  Suppliers like Sazerac and Fetzer sell to distributors, who sell to retailers, who then sell to end consumers.  Comstock Test. at 132:6-17. Because of the three-tier distribution system, alcoholic beverages are forced into the same general marketing and trade channels.  DeSarno Test. at 263:4-17; 275:10-21. 1000 Stories California zinfandel is primarily sold by Fetzer to a wholesaler, distributor, or other reseller, which then resells the wine to a retailer, typically, a grocery store, liquor store, or "on premise" account (bars and restaurants).  Pirko Test. at 485:22-486:5.  It is primarily a "supermarket brand," with 87 percent of all sales in the off-premise (grocery store/liquor store) channel.  Bianchetti Test. at 420:9-11, 435:24-437:7.  The same is generally true for Buffalo Trace.

28. For the off premise market, Fetzer focuses on "the regional retailers, so that we can build a successful story with those bigger retailers"; this includes supermarkets and grocery stores such as "national chains, [like] WalMart, Target, Kroger" and "local or regional players" such as "Publix in Florida, HEB in Texas."  Bianchetti Test. at 475:3-476:6.  Chain accounts are the primary retail outlets for 1000 Stories.  Maturana Test. at 816:2-7.  Similarly, Buffalo Trace bourbon is sold in all 50 states in the United States  in major retailers, including CVS, Costco, Kroger, Harris Teeter, Rite Aid, Publix, Target, Whole Foods, Walmart, and Walgreens. Comstock Test. at 129:15-19; 136:16-137:2l; Pirko Test. at 496:24-497:2; Ex. 70.  It is also sold online in some states. Comstock Test. at 134:13-135:4.  Sazerac advertises Buffalo Trace bourbon in print, online, via social media, and in retail locations and at bars. Comstock Test. at 88:23-89:6, 103:8-21; Ex. 60.13-20; Ex. 68.2-68.4; Ex. 72.2-3.

29. Sazerac strings together several similarities in the distribution of the two products to claim that Fetzer is trying to profit from its product, but the evidence does not hold up.  For instance, when the 1000 Stories brand was first launched, one wholesaler suggested that Fetzer use a "target list" based off Sazerac's small batch list for determining to which accounts 1000 Stories should be distributed.  Bianchetti Test. at 394:3-25.  This is common in the industry; the suggestion (of the wholesaler, not Fetzer) was not to target a list for Buffalo Trace bourbon specifically but instead to target a list for Sazerac, which has 250 brands.

United States District Court
Northern District of California

30. Sazerac points out that Fetzer's launch strategy targeted states where bourbon is popular and marketed that the 1000 Stories wine is aged in bourbon barrels. Exs. 1, 17, 18, 20, 23.3, 40, 232.1 (Supplemental Response to Interrogatory No. 2). Fetzer has sought at some times to have 1000 Stories wine positioned in retail locations near the whiskey aisle. Newman Test. at 832:10-16, 861:1-10; Ex. 34.1-4. These displays feature the phrase "bourbon barrel aged." Newman Test. at 860:17-25. The print marketing for 1000 Stories also includes "non-wine publications," Exs. 34.9, 72, 73, such as bourbon-focused magazines like The Bourbon Review and Whiskey Advocate in editions of those magazines in which Buffalo Trace bourbon was also featured. Newman Test. at 832:22-833:2; Exs. 20, 34.9-10, 47, 49, 72.2-4, 72.8-9, 73.2-4. It has participated in and marketed its product at events aimed at bourbon drinkers, such as the Bourbon Classic and Whiskey Fest. Newman Test. at 832:17-21, 833:3-14; Exs. 20, 34, 42, 43, 45, 49. At such events, its intent is for 1000 Stories to be the only wine at bourbon events and for bourbon drinkers to question why a wine is being offered at bourbon events. Newman Test. at 866:14-24; Ex. 34.11. Fetzer considered a promotion where the purchase of 1000 Stories wine would include discounts on bourbon, including, in at least on instance, specifically Buffalo Trace bourbon. Ex. 46; Ex. 30.44. One of Fetzer's distributors proposed a promotion whereby the purchase of 1000 Stories wine would include a discount on Buffalo Trace bourbon. Bianchetti Test. at 458:14-459:11; Ex. 39.12.

31. Moreover, Sazerac's target consumer for Buffalo Trace bourbon consists of male whiskey and beer drinkers between the ages of 21-30. Comstock Test. at 143:20-144:18; Ex. 60.9. Fetzer targets male beer and spirits drinkers between the ages of 25-35, and male whiskey drinkers between the ages of 30-55 for the 1000 Stories wine. Ex. 34.6; Ex. 24.6. The price points of the products were also close. A 750 ml bottle of Buffalo Trace bourbon typically retails for $25.00. Comstock Test. at 129:20-22. A 750 ml bottle of 1000 Stories wine retails for $16.99 to $18.99 on average. Maturana Test. at 774:23-25.

32. All that said, there is no evidence that 1000 Stories wine is displayed next to Buffalo Trace bourbon in the marketplace (i.e., at retail outlets or on premise accounts); that is not the reality of the marketplace, where there are typically thousands of different bottles available. Pirko Test. at

United States District Court
Northern District of California

United States District Court
Northern District of California

546:4-12; Simonson Test. at 583:5-16, 632:12-19.  While Fetzer suggested that retailers display 1000 Stories at the end of spirits aisles, there is no evidence that any retailer has ever displayed 1000 Stories within a spirits aisle.  Similarly, there is no evidence that any retailer has ever displayed 1000 Stories wine next to or among bourbons, or next to Buffalo Trace bourbon in particular.  Newman Test. at 831:14-24.  There is no evidence that any retail account has ever run a cross-promotion of 1000 Stories wine with Buffalo Trace bourbon; the cross-promotions pursued by Fetzer concerning 1000 Stories at the retail level include pizza, meat, and charcoal, but not bourbon.  Newman, 852:5-853:1.

33. 1000 Stories has been marketed in two whiskey-themed publications (a total of six advertisements in these publications that are well-over 100 pages long), and at two annual whiskey-themed events (a total of four appearances).  1000 Stories wine has more frequently been marketed in non-whiskey-themed publications and events, including Wine Enthusiast, The Wine Buzz, Tasting Panel, Somm Journal, Impact, Cigar Aficionado, Market Watch, Epicurean Charlotte Food & Wine publication, Austin Food & Wine, Pebble Beach Food & Wine, Music City Food & Wine, Beaver Creek Wine Festival, the Big Smoke, as well as other tasting events and presentations.  Moreover, Fetzer's activities in wine-focused publications have increased as such publications have increased their recognition of 1000 Stories and as 1000 Stories has received favorable scores from the Wine Enthusiast.  Blue Test. at 697:25-698:2; Newman Test. at 832:22-835:2, 865:9-19; Exhs. 72a and 73a.

34. Even though 1000 Stories wine and Buffalo Trace bourbon were both present at a whiskey-themed event in 2016 – the Bourbon Classic – and placed just two tables away from each other, there was still no indication that anyone might be drawing a false association or affiliation between the two.  Newman Test. at 855:12-856:4.

35. As reflected in Fetzer's marketing plans, its "objective" is "to establish 1000 Stories as a premium American 'craft' proposition within the wine category, partnering with select retailers and on-premise accounts."  Ex. 34.6.  As Rachel Newman, 1000 Stories' brand manager, testified, she chose "the wine category" rather than "the whiskey category" because "wine is the category that we compete in."  Newman Test. at 836:20-22.

United States District Court
Northern District of California

36. Fetzer identified the "competitive set" for 1000 Stories when it was launched.  All of the products identified in the "competitive set" are other wine brands, including Carnivor, Sledgehammer, Gnarly Head, Coppola, and Seven Deadly Zins.  Maturana Test. at 777:9-22; Ex. 40 [at slide with Bates Number ending 205].  Although that "competitive set" has changed to include other bourbon barrel aged wines, Newman Test. at 838:23-839:9, Fetzer has never identified any spirit – let alone Buffalo Trace bourbon – as a competitive product to 1000 Stories. Maturana Test. at 777:23-778:5; Newman Test. at 839:18-24 ("I'm not competing for shelf space with any non-wine products.  So I don't consider anything that isn't a wine a competitor.").

### E.       There is No Evidence of Consumer Confusion

#### 1.       Actual Confusion

37. Buffalo Trace bourbon represents approximately half a percent of total whiskey sales in the U.S.  This, combined with the extensive use of other buffalo marks discussed below, indicates that the brand is not inherently distinctive or commercially strong.  DeSarno Test. at 294:16-295:4; Johnson Test. at 327:23-328:18.  As Sazerac's survey rebuttal expert, Dr. Jacob Jacoby, explained, his assumption that the Buffalo Trace bourbon product's trade dress was "commercially weak" meant that if one were to ask consumers to name brands of bourbon "it's doubtful that the consumer would mention to you Buffalo Trace."  Jacoby Test. at 911:21-912:4.

38. In 2015, the Distilled Spirits Council of the United States identified 14 "major brands" of bourbon.  Buffalo Trace bourbon is not one of them.  DeSarno Test. at 293:11-25.  In 2015, Buffalo Trace bourbon was 18th in terms of volume of all bourbons sold in the United States. DeSarno Test. at 290:25-291:7.

39. There are, according to  DeSarno, "thousands, if not tens of thousands" of different bourbons currently marketed in the United States.  DeSarno Test. at 300:13-19.  A brand that is "one half or one third of a percent" of the relevant market is "certainly not something that's likely to be top of mind.  For a consumer to spontaneously be confused, the product they're thinking of has to be something that's top of mind in their memory, to be able to recall it."  Johnson Test. at 311:22-312:5.

40. There is no evidence that consumers of 1000 Stories wine are aware of the Buffalo Trace

bourbon trade dress, or that consumers think of Buffalo Trace bourbon when they see buffalo imagery in the marketplace. The evidence regarding actual testing for brand awareness of Buffalo Trace indicates that "brand awareness is low." Comstock Test. at 223:5-225:13; Jacoby Test. at 911:3-13.

41. In or about 2006, Sazerac commissioned focus groups to gauge consumer awareness of its Buffalo Trace bourbon brand. Comstock Test. at 83:22-84:1. This was the only consumer research Sazerac has ever done regarding consumer awareness of its Buffalo Trace bourbon brand and on the effect the appearance of the Buffalo Trace bourbon product has on the consumer. Comstock Test. at 223:5-16; 225:6-10. 50 different focus groups, 46 groups of consumers, and 4 of trade representatives, were involved in the 2006 consumer research. Comstock Test. at 224:5-7.

42. The results of the 2006 consumer research regarding awareness of the Buffalo Trace brand were "discouraging. Many of these drinkers had never heard of [the brand]. They didn't understand what a buffalo had anything to do with Kentucky or bourbon." Comstock Test. at 84:14-18.

43. One conclusion of the focus group research that was "brand recognition is low, in part, because the bottle gets lost on the shelf and lacks a highly visible and noticeable appearance." Comstock Test. at 224:15-24. The appearance of the Buffalo Trace bourbon bottle has not changed in any respect since the focus group research was done in 2006. Comstock Test. at 224:25-225:5.

44. In response to the survey, Sazerac increased its advertising and marketing efforts, attending tasting events, and communicating with consumers, distributors, and retailers in an effort to increase consumer awareness of the brand. Comstock Test. at 85:17-86:3; 92:11-16. Today, Sazerac spends approximately five million dollars in advertising, marketing, and promotion annually (up from 1.7 million in 2011) to grow the Buffalo Trace brand, including on print advertising, social media advertising, point of sale materials, tasting events, and trade shows. Comstock Test. at 88:23-89:6; 91:18-92:4; Ex. 62. Sazerac has produced over 100,000 table tents and over 100,000 coasters that are placed in bars and restaurants and that depict the Buffalo Trace trade dress. Comstock Test. at 76:11-20; 76:23-77:8. Sazerac also distributes thousands of

posters, metal signs, barrel heads, and other point of sale materials to bars and restaurants that feature the Buffalo Trace trade dress.  Comstock Test. 99:8-101:4; 102:2-24; DeSarno Test. at 260:18-261:21; Ex. 60; Ex. 97.

45. Buffalo Trace bourbon is promoted on social media sites like Twitter, Instagram, Flickr, YouTube, and Pinterest.  Buffalo Trace has 700,000 fans on Facebook, and the Facebook page includes Buffalo Trace trademarks and trade dress.  Comstock Test. at 103:14-105:23; Ex. 97.39. Sazerac receives posts, comments, and emails through these social media sites.  It also maintains a phone line for consumer feedback that receives approximately 16,000 calls a year.  It has not identified any post, comment, email, or call referring to 1000 Stories wine at all, let alone mentioning potential confusion or mistake as to some type of affiliation, association, sponsorship, or endorsement between 1000 Stories wine and Buffalo Trace bourbon.  Comstock Test. at 103:8-18, 236:4-237:15.

46. Buffalo Trace is the subject of numerous articles online and in other media, which Sazerac claims are equivalent to millions of dollars in advertising expenditures. Comstock Test. at 106:20-4. 108:5-17, 110:3-13, 113:2-19, 114:20-24; Exs. 65.1-65.6, 66, 67.

47. The majority of Sazerac's marketing and advertising efforts feature the Buffalo Trace trade dress.  Comstock Test. at 72:23-73:1, 73:4-74:10, 89:7-90:8, 238:2-239:14; Exs. 60, 62, 72, 73. All of Sazerac's marketing efforts involve the word mark BUFFALO TRACE.  Comstock Test. at 90:6-8.  Many of these efforts are directed to the Buffalo Trace Distillery and its many products, and not Buffalo Trace bourbon exclusively.

48. Sazerac asserts that its marketing efforts have increased consumer awareness of Buffalo Trace bourbon and the Buffalo Trace marks significantly.  Comstock Test. at 121:20-122:19; 125:20-126:19.  Sales of Buffalo Trace bourbon have increased over the past decade.  In 2016, Sazerac sold over 350,000 cases of Buffalo Trace-branded whiskey, compared to approximately 4000 cases in 2003 and 15,000 cases in 2006.  Comstock Test. at 84:21-23; 86:8-10; 130:3-14; Maturana Test. at 819:7-18; Ex. 62.  Buffalo Trace bourbon is sold on United Airlines flights and Spirit Airlines flights throughout the United States, and is advertised in United's in-flight magazine.  Comstock Test. at 137:7-14, 138:8-11.  Each year, Sazerac sells out of its entire supply

14

1   of Buffalo Trace bourbon. Comstock Test. at 122:9-19.

2       49. Despite this, when Sazerac's survey expert asked Sazerac's counsel to provide any

3   consumer research showing consumer awareness of the Buffalo Trace bourbon productnone was

4   provided.  Johnson Test. at 327:18-22.  There is no hard evidence of any consumer confusion with

5   1000 Stories wine.  For example, Sazerac is justifiably proud of the Buffalo Trace Distillery and

6   markets it as a tourist destination.  The public is invited to tour the distillery.  Tours are conducted

7   in groups of 40 and led by a guide, and half of those who take the tour fill out a comment card.

8   Comstock Test. at 234:13-235:16.  Sazerac has not identified a report from any tour guide of any

9   person, or anything in the hundreds of thousands of comment cards, that mentions 1000 Stories

10  wine, let alone any comment that reflects any potential confusion or mistake between 1000 Stories

11  wine and Buffalo Trace bourbon.  Comstock Test. at 235:21-236:3.

12      50. Sazerac admits that there is no evidence of any incident where a consumer was confused:

13  whether Sazerac might sell, produce, sponsor, approve, or promote 1000 Stories wine, Sazerac's

14  Responses to Requests for Admission, Exhs. 227-229, at 19 and 29; whether Sazerac might be

15  affiliated, connected, or associated with 1000 Stories wine, Sazerac's Responses to Requests for

16  Admission, Exhs. 228-229, at 30; or that Buffalo Trace bourbon might be affiliated, connected, or

17  associated with 1000 Stories wine.  Sazerac's Responses to Requests for Admission, Exhs. 228-

18  229, at 31.

19      51. Fetzer maintains social media sites for 1000 Stories, including a website at

20  1000storieswine.com and an Instagram account at 1000_Stories_Wines; it does not operate a

21  Facebook page.  Through the social media sites Fetzer receives posts, comments, and emails from

22  consumers.  Fetzer is not aware of any post, comment, or email that has ever referred in any way

23  to Buffalo Trace bourbon or Sazerac, let alone indicated that any consumer or poster has been

24  confused or mistaken that there was some affiliation, association, sponsorship, or endorsement

25  between 1000 Stories wine and Buffalo Trace bourbon. Newman Test. at 850:23-851:24.

26      52. In fact, Fetzer has not received any report from any source of any consumer being

27  confused or mistaken that there was a potential affiliation, association, sponsorship, or

28  endorsement between 1000 Stories wine and Buffalo Trace bourbon.  Bianchetti Test. at 395:8-22;

15

United States District Court
Northern District of California

1 Maturana Test. at 786:2-7; Newman Test. at 855:12-856:10; Affinity Decl., Exh. 222, at ¶¶ 17-18.

2          **2.**       **Expert Testimony**

3     53. During the course of litigation, Sazerac commissioned a consumer survey from Philip

4 Johnson.  He found that at least 46% of respondents believed that Fetzer's "1000 Stories" wine

5 shared the same source as Buffalo Trace bourbon, or that Buffalo Trace bourbon sponsored or was

6 otherwise associated with Fetzer's wine.  Johnson Test. at 306:13-307:1; 322:12-323:10.  Of that

7 46%, a majority believed that the parties' goods came from the same source or were affiliated

8 because of the buffalo logo on the 1000 Stories wine label.  Johnson Test. at 307:17-25

9     54. I am not persuaded that  Johnson's survey used the proper methodology.  He utilized a

10 "Squirt" or two-room survey methodology, in which the respondents were exposed to Buffalo

11 Trace bourbon, then asked distractor questions, then shown an array featuring zinfandels including

12 1000 Stories wine and asked questions.  The  methodology does not remotely approximate the

13 marketplace.  Johnson Test. at 309:1-14, 311:23-312:5, 314:12-315:15, 320:7-321:9, 325:5-24,

14 362:4-6; Jacoby Test.at 898:13-16, 901:3-6.

15     55. The survey forced respondents to look at only the Buffalo Trace bourbon bottle for at least

16 five seconds and then shortly thereafter exposed respondents to the 1000 Stories wine bottle.  This

17 created "demand effects" – that is, the methodology led "respondents to pick the expected answer"

18 and rendered the survey's results "completely unreliable."  Johnson Test. at 363:22-364:6;

19 Simonson Test. at 563:2-16.  It created a situation that's "not terribly likely" to happen in the

20 marketplace.  Johnson Test. at 324:25-325:1.  Johnson admitted that he had no research to support

21 the assumption that any consumer would in fact linger on the Buffalo Trace bourbon bottle for

22 five seconds or more.   Johnson Test. at 331:10-16.  His survey forced this prolonged exposure,

23 despite his understanding that when consumers visit liquor stores and grocery stores they

24 encounter literally thousands of different types of alcoholic beverages.  Johnson Test. at 331:1-5,

25 310:12-14.   Johnson also admitted that his survey is valid only if you make the assumption that

26 every person who is interested in 1000 Stories zinfandel is first exposed to the Buffalo Trace

27 bourbon product, Johnson Test. at 358:11-16, and that he had no information that any purchaser of

28 1000 Stories zinfandel actually has been exposed to the Buffalo Trace bourbon product.  Johnson

1   Test. at 329:8-11.

2       56. Johnson's survey was predicated on his understanding that 1000 Stories' use of the phrase

3   "bourbon barrel aged" was wrongful.  Johnson Test. at 317:22-318:6.  Sazerac admits it has no

4   claim over the phrase "bourbon barrel aged."  Sazerac's Responses to Requests for Admission,

5   Exhs. 227 and 229, at 16.  Johnson's survey repeatedly used the word "bourbon" in the directions

6   and questions, including in the survey's key questions, 3a, 3b, 4a and 4b.  Johnson Test. at 336:10-

7   339:20.  He admitted that there was no way to tell how many of the survey's respondents identified

8   1000 Stories in response to these "key" questions as a result of the use of the word "bourbon."

9   Johnson Test. at 339:21-24.

10      57. In addition, Johnson's survey used an improper control in that it was not as similar to the

11  allegedly infringing product as possible with only the allegedly infringing aspect removed.

12  Johnson Test. at 345:22-346:3; Simonson Test. at 573:1-10, 590:20-591:6. He selected Black

13  Sheep wine, which emulates some aspects of the 1000 Stories wine trade dress, including that it is

14  a red zinfandel in a similarly-shaped bottle that features a fuzzy animal on the label,  Johnson Test.

15  at 343:10-19.  But he did not include the term "bourbon-barrel aged" in the control although that is

16  one of the elements that Mr. Johnson was testing to determine whether it increases the potential

17  for confusion.  Johnson Test. at 317:13-318:6, 345:18-346:3, 348:15-349:1, 362:18-363:6.

18      58. Similarly, Mr. Johnson's use of the word "bourbon" in the question asking who put out the

19  bourbon respondents saw earlier was a leading question.  Johnson Test. at 338:5-14, 339:16-24.

20      59. Despite these flaws, Mr. Johnson's survey also found that only three percent of

21  respondents who found any relationship between the two brands said it was because 1000 Stories

22  "looks similar" or had "similar design or style."

23      60. Fetzer's expert, Dr. Itamar Simonson, called the survey "a textbook example of the kind of

24  survey that demonstrates the worst kind of demand effects combined with . . . [a] fatally-flawed

25  control and leading questions."  Simonson Test. at 586:14-22.

26      61. Simonson performed his own analysis as Fetzer's expert.  His areas of expertise include

27  consumer behavior, consumer decision-making, and marketing; in connection with that work, he

28  has conducted thousands of studies in the academic setting.  Simonson Test. at 559:17-25.  He

United States District Court
Northern District of California

17

testified that, based both upon a survey he conducted and upon his work as a market researcher, there is no likelihood of consumer confusion between 1000 Stories and Buffalo Trace bourbon. Simonson Test. at 585:22-586:7. I find that Simonson's opinion and the results of the survey he conducted are entitled to great weight.

62. As Simonson explained, the purpose of a likelihood of confusion survey is to determine whether there is any confusion in the marketplace as it exists. Simonson Test. at 565:1-568:14; *see also id. at* 568:21-569:4 ("It is marketplace conditions that matter. And whether or not the senior mark, Buffalo Trace, is well known or not is irrelevant. If it's not well known, you know, maybe they should have spent more on advertising. But that's not the purpose of the survey. The purpose of the survey is to find out: is there likelihood of confusion in the marketplace or not? So, therefore, there was no need to show respondent Buffalo Trace.").

63. As opposed to the two room survey methodology employed by Johnson, Simonson used a modified "Eveready" approach. Under the Eveready format, the appropriate universe is selected, exposed to the allegedly infringing product, and then asked a series of questions to determine whether the allegedly infringing product creates any confusion. Simonson Test. at 568:4-14. Simonson then modified it to expose respondents at the beginning to an array of 13 bottles that a shopper might see at a grocery or liquor store, and included in that array a bottle of Buffalo Trace bourbon. Simonson Test. at 569:5-22; 573:3-6. He considered this "an extra conservative, by which [he] meant favorable to the plaintiff," addition to the standard Eveready format. *Id*. This was "particularly favorable to plaintiffs because unlike the typical marketplace conditions respondents had every opportunity to see Buffalo Trace" bourbon. Simonson Test. at 583:20-24. As he explained, "there's no doubt that showing or giving respondents the opportunity to see Buffalo Trace just before they consider buying 1000 Stories could only raise the obtained likelihood of confusion." Simonson Test. at 610:18-21. This is due to a concept known as the "availability heuristic," which means that if one is recently exposed to something, one is far more likely to recall it shortly thereafter. Simonson Test. at 611:4-612:1. After the respondents were shown the array of products (including both the 1000 Stories/Control bottle and Buffalo Trace bourbon), the "survey continued with the standard Eveready survey questions" that "are routinely

United States District Court
Northern District of California

United States District Court
Northern District of California

asked when the Eveready survey format is used."  Simonson Test. at 581:4-12.

64. Simonson's survey specifically tested whether consumers might believe there was some affiliation or sponsorship between 1000 Stories wine and Buffalo Trace bourbon.  Simonson Test. at 581:13-582:13.   It revealed that there is "absolutely no confusion" between 1000 Stories wine and Buffalo Trace bourbon.  Simonson Test. at 583:17-20.

65. Simonson explained this result in part because "a decision to purchase wine typically belongs to the type of buying decisions known in the consumer behavior literature as 'high involvement decisions'" or "a decision that requires a great degree of care."   Simonson Test. at 584:22-585:18.  1000 Stories markets as a premium wine.  It typically retails at grocery or liquor stores from $16.99 to $18.99.  This is to maintain the wine at a "premium" price point, which is typically anything over $15 per bottle.  Newman Test. at 851:25-852:4.  Approximately 5 percent of all wine sold in the U.S. sells for more than $14 per bottle.  Bianchetti Test. at 384:21-385:3.  Further, red zinfandel is a niche varietal, representing approximately 1.5 percent of the total wine market.  Bianchetti Test. at 381:11-12.  Wine consumers purchasing from this small category of wines exhibit a high degree of care given that such wine is a "double niche" – both in terms of price and varietal; such purchases are "high involvement" decisions, according to Simonson.  Bianchetti Test. at 385:4-386:4; Simonson Test. at 584:18-585:18.

66. Sazerac's expert, Dr. Jacob Jacoby, criticized Simonson's survey.  Jacoby is a professor of marketing at New York University Graduate School of Business and owns his own firm, Jacob Jacoby Research, Inc.  Jacoby Test. at 894:13-16.  He noted that Simonson utilized a survey methodology that has not been used in any court.  Simonson Test. at 626:1-4.  It has not been peer-reviewed.  Simonson Test. at 637:18-21.  Simonson did not know whether any of the participants in his survey had ever seen a bottle of Buffalo Trace bourbon.  His methodology required respondents to scroll down on a shelf display to even have the opportunity to view Buffalo Trace bourbon, but he is not aware whether a single respondent did so, especially given that they were instructed to review the display as if they intend to purchase a bottle of red zinfandel.  Simonson Test. at 639:1-17, 640:8-11, 641:1-9, 642:2-6; Jacoby Test. at 905:18-906:2.  Simonson claims that for any respondent that did not see the Buffalo Trace bourbon, the survey

19

United States District Court
Northern District of California

operated as merely an Eveready format survey.  Simonson Test. at 638:6-25.

67. While Jacoby's points are true, they are not dispositive.   Neither an Eveready nor two room survey is appropriate here, given the manner in which the parties' goods are sold in the marketplace.  Jacoby Test. at 906:10-17.  Simonson modified the Eveready survey to more closely approximate the conditions of sale of these products in a way that was beneficial to Sazerac.  It may not have been ideal, but it is probative and is further support for my conclusion that Sazerac failed to show consumer confusion.

68. I did not find the testimony of either Drew DeSarno or Tom Pirko to be particularly helpful.  Both men have been in the industry for a considerable period, but neither supported his opinions with any studies, data, or other persuasive evidence.  As described below, Pirko did confirm that there were dozens of other alcoholic beverage suppliers who currently have products in the marketplace that use either the terms buffalo/bison or images of other animals, either through his own searches or with the help of an investigator retained by Fetzer.   Pirko Test. at 498:5-500:1.

### F.   Other Buffalo Marks Highlight the Weakness of Sazerac's Claim of Infringement

69. Sazerac has no trademark on the word "buffalo."  Comstock Test. at 183:12-13.

70. Sazerac admits that there are alcoholic beverage products, in addition to 1000 Stories wine and Buffalo Trace bourbon, currently sold in the same markets as Buffalo Trace bourbon that depict a buffalo on the front label.  Sazerac's Responses to Requests for Admission, Exhs. 228-229, at 21.   It concedes that the buffalo depicted on the 1000 Stories label is not a "reproduction," "counterfeit," or "copy" (as those terms are used in the Lanham Act) of the buffalo on the Buffalo Trace bourbon label.  Sazerac's Responses to Requests for Admission, Exhs. 228-229, at 25-27.

71. Fetzer offered proof of dozens of other beers, wines, and spirits, as well as breweries and a distillery, currently using the terms "buffalo" or "bison" or images of those animals.  *E.g.*, Pirko Test. at 498:17-508:10.

72. Buffalo Trace bourbon co-exists with "a lot" of beer producers who use buffalo images or names.  Comstock Deposition Excerpts, Exh. 230, at 249:11-15.  In fact, Sazerac admits that

20

United States District Court
Northern District of California

buffalos are "pervasive" in beer products.  *Id*. at 309:13-310:5.  Fetzer produced evidence concerning the following beers and breweries: Beachwood Brewing Imperial Stout - Bourbon Barrel Aged (and, as depicted during trial, it is referred to as "8 Buffalo") Pirko Test. at 500:25-5015, Big Bison Ale, Pirko Test. at 501:6-11, several beers from the Bison Brewing Company (available at TotalWine.com), Pirko Test. at 501:12-502:12, Buffalo Sweat beer, Pirko Test. at 502:24-503:8, Flying Bison Beer, Pirko Test. at 503:9-18, Casper White Stout (which, as depicted during trial, bears a buffalo image on the front label), Pirko Test. at 504:12-15; Buffalo Bayou Beer, Pirko Test. at 505:6-9, Buffalo Butt Beer, Pirko Test. at 505:13-15, Buffalo Water Bison Blend, Pirko Test. at 505:16-21, Buffalo Gold Beer, Pirko Test. at 505:16-506:1, Buffalo Bill's Brewery – Pumpkin Ale, Pirko Test. at 506:2-6, Buffalo Spit Stout, Pirko Test. at 506:7-15, One Buffalo Beer, Pirko Test. at 506:16-20, and Big Sky Rye, Comstock Test. at 212:16-25; Exh. 145. Of these, Sazerac has entered into coexistence agreements with Buffalo Sweat, Buffalo Bayou, Buffalo Water, Buffalo Spit, and One Buffalo, as well as Mad Buffalo Brewing Co., Buffalo Peaks beer, Buffalo Check beer, Broncksland Brewing Co. (regarding a "buffalo design" in beer), and a hard cider called Buffalo Stance.  Exhs. 86, 88-93, 212-214, 216.

73. Buffalo Trace bourbon also co-exists with wines that use buffalo images or names. Comstock Test. at 213:7-214:6.  For example, Sazerac is aware of and has discussed Buffalo Grove wine, but has taken no action regarding that wine's use of either the word "buffalo" or the buffalo image on that wine's label, a wine that Sazerac knows is sold at Total Wine and More, an outlet that also sells Buffalo Trace bourbon.  Comstock Test. at 213:7-214:15.  The same is true for Buffalo Jump wines, Comstock Test. at 216:17-217:13; Ex. 218, and Buffalo Head wine, Comstock Test. at 215:21-216:1; Ex. 217.  Lone Buffalo Vineyards, Pirko Test. at 504:17-21, and Buffalo Hill Rockpile Vineyard Syrah, Pirko Test. at 506:21-507:4 also use buffalo images or names.  Sazerac has entered into coexistence agreements with Buffalo Jump, Buffalo Creek wine and Broadland Wineries (regarding a "buffalo head" mark).  Exhs. 110, 217, 218.

74. Buffalo Trace bourbon also co-exists with both spirits and a distillery that use buffalo images and names.  The Buffalo Bayou Distillery uses that name on a distillery that markets and sells distilled spirits, which is exactly what Buffalo Trace Distillery does.  Comstock Test. at

218:22-219:14; Ex. 87.  Buffalo Trace bourbon also co-exists with Bison Ridge Canadian whiskey,  Comstock Test. at 219:19-221:2; Ex. 85,  Bak's Bison Grass Vodka (which contains both a silhouette of a buffalo head and a buffalo in profile on the bottle), a product Sazerac has known about for years, Comstock Test. at 221:11-222:9, Grasovka Vodka, which Sazerac has known existed since approximately 2006 and which contains a similar buffalo image to the Buffalo Trace bourbon buffalo, Comstock Test. at 222:10-223:4, and Zubrowka Bison Brand Vodka, Pirko Test. at 504:7-11.  Of these, Sazerac has entered into a settlement agreement with Bison Ridge whiskey (which allowed it to keep the word "Bison" on a whiskey label) and a coexistence agreement with the Buffalo Bayou Distillery.  Exhs. 85, 87.  Sazerac has not asserted any claim against Grasovka vodka, a spirit sold in a clear bottle the front label of which features a buffalo strikingly similar to the Buffalo Trace buffalo.  Comstock Test. at 222:22-223:4; Exh. 221 at p. 1 (depicting image of the Grasovka brand).

75. In total, Sazerac has entered into co-existence agreements pertaining to at least 14 different producers of alcoholic beverages with buffalo images and names: Buffalo Bayou Brewing Co., Buffalo Bayou Distillery, Buffalo Water Beer Co., Buffalo Spit Beer, Mad Buffalo Brewing Co., One Buffalo beer, Buffalo Peaks beer, Buffalo Sweat beer (which featured a buffalo and the words "bourbon barrel aged" on a beer product), Buffalo Creek wine, Buffalo Check beer, Broncksland Brewing Co. (regarding a "buffalo design" in beer), Buffalo Stance hard cider, Broadland Wineries (regarding a "buffalo head" mark), and Buffalo Jump wine.  Exhs. 86-93, 110, 213-214, 216-218.

76. The co-existence agreements referred to above do not have provisions restricting how many cases of product a party may produce under the buffalo/bison name or image or preventing the use of the word "bourbon" on the good that bears the buffalo/bison name or image.  Comstock Test. at 245:3-14.  Indeed, Buffalo Sweat beer was already using the combination of buffalo imagery and "bourbon barrel aged," and Sazerac did not require that company to alter its label to remove that combined use so long as the company did not extend the brand into spirits.  Exh. 93.  Nor did the co-existence agreements restrict the way in which the buffalo/bison imagery is displayed.  For instance, Sazerac tried to force Buffalo Bayou to always include other imagery

with the buffalo depiction on its beer, Buffalo Bayou refused, and Sazerac consented that such

other imagery was not required for the two products to coexist.  Compare Exh. 86 (final

agreement) at pp. 3-4 with Exh. 212 (earlier draft) at p. 5; *see also* Comstock Test. at 200:23-

202:9.  It also entered into a settlement agreement that allows a competitor to use the word mark

BISON RIDGE on a Canadian whiskey.  Exh. 85.

### G.  Summary Findings

77. Sazerac failed to establish that the alleged Buffalo Trace trade dress acquired secondary

meaning.  The Johnson survey admittedly did not try to test for secondary meaning.  Johnson Test.

at 327:7-10.  Similarly, Sazerac's other survey/marketing expert, Dr. Jacoby, did nothing to try to

determine whether Buffalo Trace bourbon's claimed trade dress had acquired secondary meaning.

Jacoby Test. at 910:4-7.  Indeed,  Jacoby assumed that the Buffalo Trace bourbon product had a

commercially weak trade dress.  Jacoby Test. at 911:8-13.

78. Sazerac's other attempts to establish brand awareness pertain to sales and advertising

efforts concerning Buffalo Trace bourbon, the fact that visitors at its distillery (which produces

numerous products, including at least 15 other bourbons) have increased, and a few anecdotal

stories of people commenting on "Buffalo Trace" clothing (which pertain to several products and

the distillery, not just Buffalo Trace bourbon).  There is no evidence that such advertising has been

effective at increasing brand awareness, or that such sales or increase in visitors are due to the

appearance of the Buffalo Trace bourbon brand (as opposed to another product produced at the

distillery, the quality of the Buffalo Trace bourbon product, or something else entirely).  The

handful of anecdotal incidents described by Sazerac's witness Kris Comstock lack any significant

weight given that there are very few examples, limited to a small geographical region, and that the

incidents primarily related to the words "Buffalo Trace," not the primary brand element at issue in

this case, the buffalo logo.  Comstock Test. at 121:20-122:19, 227:13-229:15; DeSarno Test. at

288:20-290:24, 294:16-295:4; Johnson Test. at 327:11-330:13; Exh. 102 at slide 10.

79. There is no evidence that Sazerac plans to line-extend its Buffalo Trace bourbon brand into

wine, or that Fetzer intends to line-extend its 1000 Stories wine brand into bourbon.  There is no

example out of the thousands of distilleries and wineries in the United States of the same brand

being line-extended from the spirits to the wine category, or vice versa (the small handful of examples of line-extension cited by DeSarno involve the same company producing multiple categories of beverage products, not extending of the same brand across alcohol beverage categories).  DeSarno Test. at 287:14-18; Pirko Test. at 510:7-512:22.

80.  No sales of Buffalo Trace bourbon have been lost as a result of anything 1000 Stories has done.  Comstock Test. at 194:21-24.  To the contrary, the evidence is that sales of Buffalo Trace have continued to increase since 1000 Stories entered the market.  Comstock Test. at 86:6-10; DeSarno Test. at 300:20-301:1.

81.  There is no evidence of any sales of 1000 Stories wine having been made as a result of any consumer making some sort of association with Buffalo Trace bourbon.  Comstock Test. at 195:4-7.)

82.  Bianchetti testified that an injunction would be "devastating" to Fetzer.  Bianchetti Test. at 395:23-396:5.  It would damage its credibility with, and the trust of, its wholesalers who have purchased and distributed the 1000 Stories product, as well as the retailers who have purchased and stocked the 1000 Stories product.  Bianchetti Test. at 396:8-397:6.  The effect of any injunction would likely have a direct financial impact on Fetzer: the 1000 Stories brand currently accounts for approximately 15 percent of Fetzer's gross profit.  Bianchetti Test. at 397:7-10.

83.  The buffalo image is one of the core items of 1000 Stories.  An injunction requiring that the buffalo image be modified or removed would create a real risk to the brand.   Bianchetti Test. at 397:20-398:9, 466:6-467:17.

### CONCLUSIONS OF LAW

Sazerac asserted claims for trademark and trade dress infringement as well unfair competition under the Lanham Act, 15 U.S.C. § 1051 *et seq*. and under related provisions of California state law, including California Business & Professions Code § 17200 *et seq*., as well common law trademark infringement,[1] concerning (1) the BUFFALO TRACE word mark; (2) the

---

[1] The Ninth Circuit "has consistently held" that these state law claims are 'substantially congruent' to claims made under the Lanham Act."  *Cleary v. News Corp.*, 30 F.3d 1255, 1263 (9th Cir. 1994).

United States District Court
Northern District of California

1   Buffalo Logo; and (3) the Buffao Trace Trade Dress.  As to each of these claims, Sazerac had to

2   prove that (i) it owns valid and enforceable trademarks or trade dress, as applicable, and (ii) that

3   Fetzer's use of a buffalo logo and/or the 1000 Stories trade dress in connection with its 1000

4   Stories product is likely to cause confusion among ordinary consumers, or to deceive ordinary

5   consumers, (a) about the source, sponsorship, affiliation or approval of Fetzer's 1000 Stories wine,

6   and/or (b) as to the affiliation, connection, or association of Fetzer with Sazerac.  *See* 15 U.S.C. §

7   1114(1)(a); 15 U.S.C. § 1125(a)(1); *see also Intel Corp. v. Ams. News Intel Publ'g, LLC*, C 09-

8   05085, 2010 WL 2740063, at *2 (N.D. Cal. Jul. 12, 2010) (citing *Century 21 Real Estate Corp. v.*

9   *Sandlin*, 846 F.2d 1175, 1178 (9th Cir. 1998)).   It failed in all respects.

10  **I.      SAZERAC FAILED TO PROVE TRADEMARK INFRINGEMENT**

11          Sazerac's BUFFALO TRACE word mark (U.S. Reg. Nos. 2,622,735; 2,294,792;

12  4,859,200), and its Buffalo Logo mark (U.S. Reg. No. 2,601,650) are federally registered.  Fetzer

13  did not challenge their validity, so they are presumptively valid for bourbon. 15 U.S.C. § 1115;

14  *see Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 782–83 (9th Cir. 2002).  Sazerac relied on the

15  "colorable imitation" theory of trademark infringement, *see* 15 U.S.C. § 1114, but failed to present

16  any evidence that Sazerac's Buffalo Logo creates the same commercial impression as Fetzer's

17  buffalo.  Rather, it consistently pursued its claim that it was the *combination* of Fetzer's buffalo

18  with the reference to "bourbon" in "BOURBON BARREL AGED" that confused consumers as to

19  the source of Fetzer's 1000 Stories wine.  This claim sounds in trade dress.

20          The doctrine of equivalents does not help Sazerac's trademark infringement case because

21  the entire mark must be considered, and nothing on the 1000 Stories bottle is similar to the

22  BUFFALO TRACE word mark.  *See Moose Creek, Inc. v. Abercrombie & Fitch Co.*, 331 F. Supp.

23  2d 1214, 1229 (C.D. Cal.)(finding plaintiffs' "Moose Creek" word marks not similar in

24  appearance to defendant's moose logo, in part because the doctrine of picture-word equivalency

25  requires the picture mark to portray the entirety of the word mark).  Sazerac's trademark

26  infringement claims fail.

27  **II.     SAZERAC FAILED TO PROVE TRADE DRESS INFRINGEMENT**

28          "In addition to protecting registered marks, the Lanham Act, in § 43(a), gives a producer a

25

United States District Court
Northern District of California

cause of action for the use by any person of 'any word, term, name, symbol, or device, or any combination thereof ... which ... is likely to cause confusion ... as to the origin, sponsorship, or approval of his or her goods....'" *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 209 (2000)(quoting 15 U.S.C. § 1125(a)).  "Trade dress involves the total image of a product and may include features such as size, shape, color, color combinations, texture, or graphics[,]" and "protection is broader in scope than trademark protection, both because it protects aspects of packaging and product design that cannot be registered for trademark protection and because evaluation of trade dress infringement claims requires the court to focus on the plaintiff's entire selling image, rather than the narrower single facet of trademark." *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 613 (9th Cir. 1989).  To establish its trade dress infringement claim, Sazerac must prove: "(1) the trade dress is inherently distinctive or has acquired distinctiveness through secondary meaning;[2] (2) there is a likelihood that the public will be confused by the infringing use; and (3) the trade dress is nonfunctional." *Stephen W. Boney, Inc. v. Boney Servs., Inc.*, 127 F.3d 821, 828 (9th Cir. 1997).

### A.    Sazerac Failed to Prove that its Unregistered Trade Dress is "Distinctive"

#### 1.    Sazerac's Trade Dress is Not Inherently Distinctive

Under the Lanham Act, "[t]he predominant test for inherent distinctiveness asks whether (1) the design or shape is a common, basic shape or design; (2) it was unique or unusual in a particular field; and (3) it was a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods which consumers view as mere ornamentation." *Mattel, Inc. v. MGA Entm't, Inc.*, 782 F. Supp. 2d 911, 1004 (C.D. Cal. 2011)(quotation marks omitted).  "In other words, if the trade dress is of such an unusual design that a buyer will immediately rely on it to differentiate the source of the product, then it is inherently distinctive." *Id*. (quotation marks omitted).  Courts must look at the trade dress as a whole in assessing its inherent distinctiveness. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1259 (9th Cir.

---

[2] "Nothing in § 43(a) explicitly requires a producer to show that its trade dress is distinctive, but courts have universally imposed that requirement, since without distinctiveness the trade dress would not 'cause confusion ... as to the origin, sponsorship, or approval of [the] goods,' as the section requires." *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 210 (2000).

1   2001).

2        Sazerac failed to submit any evidence that consumers rely on the Buffalo Trace trade dress

3   to identify its source.  It sought to rest on its assertion that the Buffalo Trace trade dress is of

4   "sufficiently unusual design such that consumers will rely upon it."  But Fetzer submitted

5   extensive evidence of other alcoholic beverages with trade dresses that include a buffalo image,

6   some with similarly "realistic" depictions.  Moreover, Sazerac's own evidence showed that

7   Buffalo Trace has low brand recognition and comprises only one half of one percent of the

8   whiskey market.  There is simply no basis for a finding that Sazerac's Buffalo Trace trade dress is

9   inherently distinctive.

10        **2.      Sazerac Failed to Prove that its Trade Dress Acquired Distinctiveness
            through Secondary Meaning**

11        "To establish secondary meaning, a manufacturer must show that, in the minds of the

12   public, the primary significance of a product feature or term is to identify the source of the product

13   rather than the product itself."  *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n.11

14   (1982).  The Ninth Circuit defines secondary meaning as "the mental association by a substantial

15   segment of consumers and potential consumers between the alleged mark and a single source of

16   the product."  *Levi Strauss & Co. v. Blue Bell, Inc.,* 778 F.2d 1352, 1354 (9th Cir. 1985).

17   Consumers need not be able to identify the source of the product by name.  *See Two Pesos*, 505

18   U.S. at 769–770.  In determining whether a plaintiff's trade dress has acquired secondary meaning,

19   courts consider the following factors: "direct consumer testimony; survey evidence; exclusivity,

20   manner, and length of use of a mark; amount and manner of advertising; amount of sales and

21   number of customers; established place in the market; and proof of intentional copying by the

22   defendant."  *Filipino Yellow Pages, Inc. v. Asian Journal Publications, Inc.*, 198 F.3d 1143, 1151

23   (9th Cir. 1999).

24        Sazerac produced no evidence of direct consumer testimony showing that its claimed trade

25   dress had acquired secondary meaning, nor did it provide a survey professing to demonstrate such.

26   Rather, it focused on its purported continuous and exclusive use of the Buffalo Trace trade dress,

27   its sales of millions of bottles of Buffalo Trace, its advertising efforts focused on Buffalo Trace,

28

United States District Court
Northern District of California

and awards and recognition associated with Buffalo Trace.  In the summary judgment order, I considered some of this evidence and found that,

> Buffalo Trace's 'thousands of followers' and significant sales may be attributable to its award-winning bourbon alone, which would not necessarily suggest associating secondary meaning to its trade dress or marks.  But these indicators of success may also have led consumers to associate Buffalo Trace's buffalo (or similar looking buffalo) and trade dress with a single source.

Dkt. No. 80 at 16.  Sazerac, however, failed to demonstrate how its evidence proves that Buffalo Trace's trade dress has acquired secondary meaning.  "While evidence of a manufacturer's sales, advertising and promotional activities may be relevant in determining secondary meaning, the true test of secondary meaning is the *effectiveness* of this effort to create it."  *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 824 (9th Cir. 1993)(emphasis added).  Sazerac provided no evidence that its marketing efforts effectively created secondary meaning, or that its sales are due to Buffalo Trace's trade dress.  *See Art Attacks Ink, LLC v. MGA Entm't Inc.*, 581 F.3d 1138, 1146 (9th Cir. 2009).

Moreover, "secondary meaning requires more than extensive use alone."  *Id.* at 1146.  In short, Sazerac failed to demonstrate the distinctiveness of the Buffalo Trace trade dress.  Its claims predicated on the unregistered trade dress must fail.  Nonetheless, I will continue to assess the likelihood of confusion, just to emphasize the scarcity of the evidence Sazerac presented.

### B.    Sazerac Failed to Demonstrate A Substantial (or Any) Likelihood of Confusion

"The test for likelihood of confusion is whether a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks."  *Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998).  "Likelihood of confusion exists when consumers are likely to assume that a product or service is associated with a source other than its actual source because of similarities between the two sources' marks or marketing techniques."  *Shakey's Inc. v. Covalt*, 704 F.2d 426, 431 (9th Cir. 1983).  In analyzing the likelihood of confusion, the Ninth Circuit assesses the *Sleekcraft* factors:

> similarity of the conflicting designations; relatedness or proximity of the two companies' products or services; strength of [plaintiff's] mark; marketing channels used; degree of care likely to be exercised

United States District Court
Northern District of California

28

United States District Court
Northern District of California

by purchasers in selecting goods; [defendant's] intent in selecting its mark; evidence of actual confusion; and likelihood of expansion in product lines.

*Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1053–54 (9th Cir. 1999). The eight factor test is "pliant" and "the relative importance of each individual factor [is] case-specific." *Id.* at 1054.

### 1.     Similarity of the Trade Dresses

"Three general principles help determine whether marks are similar. First, similarity is best adjudged by appearance, sound, and meaning. Second, the marks must be considered in their entirety and as they appear in the marketplace. Third, similarities are weighed more heavily than differences." *Fortune Dynamic*, 618 F.3d at 1032 (quotation marks and citations omitted). Sazerac argued that the "overall appearance" of the trade dresses is substantially similar, and Fetzer's use of the phrase "BOURBON BARREL AGED" served to "enhance that similarity."

As noted in the factual findings, I disagree that the trade dresses are substantially similar. The similarities are limited to the presence of a large buffalo on the main label, a smaller buffalo on the neck, and the use of gold and white lettering. Beyond those features, the differences overwhelm. The two products employ distinct brand names, colors, shapes, and words, and different looking versions of the same species of American buffalo. The buffalos differ in the direction they face (left versus forward), styles (sketched versus photograph-like), colors (gray versus brown), posture (walking in profile versus charging head on), and framing (fully displayed versus cut-off on top and bottom). And both products prominently feature their respective brand name, which may nullify any potential for a false affiliation. *See Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1046 (2d Cir. 1992)("Despite the similarity between certain aspects of the two trade dresses, when taken as a whole, including the prominently displayed names, they are not similar in any manner that is likely to cause consumer confusion[.]"

In sum, Sazerac failed to present any evidence that the overall appearance of Fetzer's 1000 Stories is so similar to its Buffalo Trace trade dress that it is likely to confuse consumers.

### 2.     Proximity or Relatedness of the Goods

"For related goods, the danger presented is that the public will mistakenly assume there is

United States District Court
Northern District of California

an association between the producers of the related goods, though no such association exists." *Sleekcraft Boats*, 599 F.2d at 350. "The more likely the public is to make such an association, the less similarity in the marks is requisite to a finding of likelihood of confusion." *Id*.

Both Sazerac's Buffalo Trace bourbon and Fetzer's 1000 Stories wine participate in the same general alcoholic beverage industry. And Sazerac presented evidence that the products are advertised and marketed in overlapping channels. But they are nonetheless very distinct products. They have different alcohol contents and social uses, and they occupy different sections of the stores where they are offered for sale. Sazerac produced no evidence that a consumer is likely to associate a California red zinfandel with a Kentucky bourbon whiskey.

For these reasons, the proximity or relatedness of these alcoholic beverage products may weigh slightly in Sazerac's favor, but not significantly so.

### 3.      Strength of the Mark

"The 'strength' of a trademark is evaluated both in terms of its conceptual strength and its commercial strength." *Stark v. Diageo Chateau & Estate Wines Co.*, 907 F. Supp. 2d 1042, 1058 (N.D. Cal. 2012). "A mark's conceptual strength depends largely on the obviousness of its connection to the good or service to which it refers." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt.*, Inc., 618 F.3d 1025, 1032-33 (9th Cir. 2010). Sazerac's Buffalo Trace marks have no obvious or inherent connection to alcoholic beverages generally, or bourbon in particular. They are, therefore, conceptually strong.

But their commercial strength is questionable. Sazerac offered little evidence demonstrating that its Buffalo Trace trade dress or marks have "actual marketplace recognition." *See Brookfield*, 174 F.3d at 1058. It pointed to its continuous and exclusive use of the marks, its sales of millions of bottles of bourbon bearings the marks, its extensive advertising using the marks, and awards associated with the brand. Nonetheless, the only relevant survey results indicated that consumers had low awareness of the Buffalo Trace brand. Further, it is not listed as a "major brand" by the Distilled Spirits Council of the United States, and its sales are ranked eighteenth among bourbon sales in the country. When considering that evidence in the context of the widespread use of buffalo marks by others in the alcoholic beverage industry, I am not

1    convinced that Sazerac's Buffalo Trace trade dress is commercially strong.

2    **4.    Defendant's Intent in Selecting the Mark**

3    "The law has long been established that if an infringer 'adopts his designation with the

4    intent of deriving benefit from the reputation of the trade-mark or trade name, its intent may be

5    sufficient to justify the inference that there are confusing similarities.'" *Pac. Telesis Grp. v. Int'l*

6    *Telesis Commc'ns*, 994 F.2d 1364, 1369 (9th Cir. 1993).  Sazerac failed to present any evidence

7    that Fetzer *adopted* the 1000 Stories trade dress with an intent to cause consumer confusion.  To

8    the contrary, Fetzer presented compelling evidence of the story behind its decision to select the

9    American buffalo for its 1000 Stories brand.  Sazerac did, however, offer evidence that Fetzer

10   became aware of the risk of a potential association between the brands while it was pursuing

11   marketing and promotional opportunities.  But "[k]nowledge of another's product and an intent to

12   compete with that product is not, however, equivalent to an intent by a new entrant to a market to

13   mislead and to cause consumer confusion." *Gen. Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 627

14   (8th Cir. 1987).

15   Moreover, Fetzer's failure to conduct a trademark clearance prior to brand launch may

16   demonstrate carelessness, but it is not evidence of intent. *See George & Co. LLC v. Imagination*

17   *Entm't Ltd.*, 575 F.3d 383, 398 (4th Cir. 2009)("[T]he failure to conduct a trademark search or

18   contact counsel shows carelessness at most, but is in any event irrelevant because knowledge of

19   another's goods is not the same as an intent 'to mislead and to cause consumer confusion.'").  And,

20   Fetzer did contact counsel and conduct a search after receiving Sazerac's cease and desist letter.

21   That it decided to continue using the 1000 Stories trade dress after receiving the letter and

22   investigating Sazerac's claims, and therefore did nothing to mitigate the risk of confusion, is

23   insufficient to show its intent to infringe.

24   **5.    Evidence of Actual Confusion**

25   Evidence of actual confusion is persuasive, but courts have recognized the difficulty in

26   proving it and found that failure to show it is not dispositive. *Sleekcraft*, 599 F.2d at 352–53.

27   "[W]here competing marks have been in use for a significant period of time, lack of actual

28   confusion is significant." *Cutting Edge Sols., LLC v. Sustainable Low Maint. Grass, LLC*, No. 14-

United States District Court
Northern District of California

31

1   CV-02770-WHO, 2014 WL 5361548, at *13 (N.D. Cal. Oct. 20, 2014).

2       The products have co-existed on the market for almost three years.  During that time,

3   Fetzer has sold nearly two million bottles of 1000 Stories wine and Sazerac has sold more than 10

4   million bottles of Buffalo Trace bourbon.  And nearly half a million people have visited Sazerac's

5   Buffalo Trace Distillery, with hundreds of thousands of them leaving comment cards, and

6   thousands more posting comments on the parties' respective social media sites, sending emails, or

7   calling Sazerac's 1-800 number.  Despite this extensive presence, coexistence, and interaction

8   with consumers, there is no evidence of a single instance of actual confusion.  The significance of

9   this lack of actual confusion is bolstered by the fact that the products even appeared two tables

10  apart from each other at the 2016 Bourbon Classic, and yet neither party was notified of any

11  consumer confusion.

12      It is "the rare case in which a likelihood of future confusion is possible even where it is

13  conceded that two marks have been used simultaneously for years with no resulting confusion[.]"

14  *Brookfield*, 174 F.3d at 1050.  To this end, "[s]urvey evidence may establish actual confusion."

15  *Fortune Dynamic*, 618 F.3d at 1035.  Sazerac's expert, Phil Johnson, offered a survey purporting

16  to demonstrate a 46 percent chance of confusion.  But Dr. Simonson identified numerous flaws in

17  Johnson's survey and convincingly established that it should be given no weight.[3]  Accordingly, I

18  conclude that there is no evidence of actual confusion.

19              **6.      The Marketing Channels Used**

20      Under this factor, courts should "consider whether the predominant purchasers of the

21  parties' goods are similar or different, and whether the parties' marketing approaches resemble

22  one another."  *Fiji Water Co., LLC v. Fiji Mineral Water USA, LLC*, 741 F. Supp. 2d 1165, 1180

23  (C.D. Cal. 2010)(quotation marks omitted).  Sazerac presented some evidence of overlap in the

24  parties' marketing channels.  But the narrow overlap is dwarfed by the other factors, especially

---

[3] The flaws, as noted in the factual findings, include numerous "demand effects," including: forcing significant exposure to the accusing product, leading questions essentially asking respondents to "match" the products that include the word "bourbon," and using an ineffective control.  As Fetzer pointed out, despite all of these flaws, only three percent of respondents indicated that the purported relationship between the two was based on some similarity.

United States District Court
Northern District of California

considering that the products occupy different places in the market.

### 7.    The Likelihood of Expansion into other Markets

"To resolve this factor, [the court] must determine whether existence of the allegedly infringing mark is hindering the plaintiff's expansion plans." *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 634 (9th Cir. 2005). Sazerac offered no evidence that it intends to expand Buffalo Trace into the wine market; and Fetzer does not intend to expand 1000 Stories into the spirits market. Sazerac argued that this factor is "relatively unimportant" because the two companies already compete. *See Brookfield*, 174 F.3d at 1060. I disagree. It failed to submit any evidence that the companies *actually* compete with one another, simply because they both produce alcoholic beverages. Therefore, this factor, as with many of the others, does not help Sazerac's case.

### 8.    The Degree of Care Likely to be Exercised by Purchasers of the Defendant's Product

The "reasonably prudent consumer" is expected "to be more discerning—and less easily confused—when he is purchasing expensive items." *Brookfield Comm., Inc.*, 174 F.3d at 1060. Purchasers of premium alcoholic beverages tend to exercise a high degree of sophistication and care when making their purchasing decisions. *See Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 390 (2d Cir. 2005)("Unhurried consumers in the relaxed environment of the liquor store, making decisions about $12 to $24 purchases, may be expected to exhibit sufficient sophistication to distinguish between Star's and Bacardi's products, which are differently labeled."). This is especially true considering that 1000 Stories is a "double niche" wine product—existing at a price point ($14.00 and above) that is merely 5 percent of the total wine market, and a varietal (red zinfandel) that is only 1.5 percent of the market. Purchasers of a premium red zinfandel, therefore, are expected to exercise a high degree of care and are less likely to make mistakes as to product original, sponsorship, or affiliation. This factor supports Fetzer.

Considering all of the *Sleekcraft* factors leads me to conclude that there is no likelihood of confusion between Sazerac's Buffalo Trace and Fetzer's 1000 Stories.

United States District Court
Northern District of California

### III.     EVEN IF SAZERAC PROVED TRADE DRESS INFRINGEMENT, IT WOULD NOT BE ENTITLED TO INJUNCTIVE RELIEF

"[A]ctual irreparable harm must be demonstrated to obtain a permanent injunction in a trademark infringement action." *Herb Reed Enterprises, LLC v. Florida Entm't Mgmt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013).  Sazerac argued that "[l]oss of control over business reputation and damage to goodwill are cognizable irreparable harms in the trademark infringement context[,]" *OTR Wheel Eng'g, Inc. v. W. Worldwide Servs.*, 602 F. App'x 669, 672 (9th Cir. 2015), but offered zero evidence that its goodwill was actually damaged by 1000 Stories.  To the contrary, Buffalo Trace continues to perform well, there is no evidence of actual confusion, and no indication that consumers of 1000 Stories are even aware of Buffalo Trace.

The complete dearth of evidence of irreparable harm sufficiently dooms Sazerac's claim for injunctive relief. [4]

---

[4] I take this opportunity to resolve the motions to seal that remain pending on the docket.  Fetzer filed an Administrative Motion to Seal documents or portions of documents attached to its motion for summary judgment, which Sazerac had identified as "Confidential" or "Highly Confidential" under the Protective Order.  Dkt. No. 64.  And Sazerac filed an administrative motion to seal a confidential declaration and attached exhibits, submitted in support of its opposition to summary judgment.  Dkt. No. 70.  In the Order on Fetzer's Motion for Summary Judgment, I directed Sazerac to file a declaration establishing compelling reasons to seal the information it had designated Confidential or Highly Confidential.  Dkt. No. 80 at 2.  Sazerac submitted that declaration and established compelling reasons for sealing the highly sensitive information about Sazerac's marketing strategy, target consumers, trademark enforcement strategy, the manner in which Sazerac fields and reviews consumer inquiries, and confidential settlement agreements.  Dkt. No. 81.  Accordingly, the administrative motions at docket entries 64 and 70 are GRANTED.

Sazerac also filed administrative motions to seal its proposed findings of fact and conclusions of law, as well as several trial exhibits, and its opposition to Fetzer's motions *in limine*.  Dkt. Nos. 93, 100.  The material pertains to the same confidential business information that could damage Sazerac's business and competitive position in the market if it became public.  Those motions are also GRANTED.

**CONCLUSION**

In light of the findings of fact and conclusions of law, I find in favor of defendant Fetzer and against plaintiff Sazerac, and will enter judgment accordingly.

**IT IS SO ORDERED.**

Dated: September 19, 2017

William H. Orrick
United States District Judge