UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAZERAC COMPANY, INC., et al., | Case No.  3:15-cv-04618-WHO |
| Plaintiffs, | |
| v. | **ORDER ON FETZER'S MOTION FOR ATTORNEYS' FEES** |
| FETZER VINEYARDS, INC., | Re: Dkt. No. 150 |
| Defendant. | |

## INTRODUCTION

Fetzer Vineyards, Inc. ("Fetzer") moved for attorneys' fees after its successful defense of this Lanham Act case. A prevailing party is only entitled to fees if the case is "exceptional." While I concluded that this was "not a close case," the determination of whether this case is "exceptional" was a close call. This was an exceptionally weak case. But I do not doubt Sazerac's motive in bringing it—it wanted to protect what it perceived as a potential loss of control over its brand. There is no evidence of bad faith. But what makes this case "stand[] out from other[]" exceptionally weak cases is that Sazerac proceeded to trial—where the only available remedy was injunctive relief—with zero evidence that it had been harmed in any way. Its decision to continue litigation unnecessarily burdened the court and defendant. For that reason, and considering the case's exceptionally low merit, I am awarding Fetzer attorneys' fees in the amount of $518,817.73, reflecting the actual amount of fees incurred after the summary judgment order.

## BACKGROUND

### I.    PROCEDURAL HISTORY

Sazerac initiated this lawsuit on October 6, 2015, and filed an amended complaint on

United States District Court
Northern District of California

March 3, 2016.  First Am. Compl. (Dkt. No. 36).  It alleged that Fetzer's 1000 Stories red zinfandel buffalo mark and trade dress infringe its BUFFALO TRACE word mark, Buffalo logos, and trade dress for its BUFFALO TRACE bourbon whiskey.  It asserted six claims for trademark infringement under 15 U.S.C. § 1114, pertaining to eight different trademark registrations, one claim for trade dress infringement under 15 U.S.C. § 1125(a), and related claims for false designation of origin, common law trademark infringement, and unfair competition.  *Id*. 20, 34–61.  It sought both monetary damages and injunctive relief.  *Id*.

On February 16, 2017, Fetzer moved for summary judgment on all of Sazerac's claims.  Dkt. No. 63.  I granted its motion regarding six of the trademarks, but denied it concerning the other two marks and the trade dress claim.  ("SJ Order")(Dkt. No. 80).  I also granted Fetzer's request to preclude monetary damages because Sazerac failed to disclose an expert to prove damages, as it indicated it would in its initial disclosures.  *Id*. at 22–23.  Since the case thereafter concerned only injunctive relief, the parties agreed that it would be tried to the court.  Following a bench trial from June 26 through 30, and closing arguments on August 14, I issued my findings of fact and conclusions of law on September 19, 2017.  ("Trial Order")(Dkt. No. 141).  Judgment was entered the same day.

On October 3, 2017, Fetzer moved for an award of $1,504,767.17 in attorneys' fees under the Lanham Act.  In the alternative, it seeks $518,817.91 incurred by WSHB and FBM from May through August.

## II.    FACTUAL BACKGROUND

The Trial Order contains a complete factual background, which I will not repeat in its entirety.  But it's important that I excerpt relevant portions of the Trial Order to provide context for this order.

On the trademark infringement claims, "Sazerac concede[d] that the buffalo depicted on the 1000 Stories label is not a 'reproduction,' 'counterfeit,' or 'copy' (as those terms are used in the Lanham Act) of the buffalo on the Buffalo Trace bourbon label."  Trial Order, Findings of Fact ¶ 70.  It "relied on the 'colorable imitation' theory of trademark infringement, *see* 15 U.S.C. § 1114, but failed to present any evidence that Sazerac's Buffalo Logo creates the same commercial

impression as Fetzer's buffalo." Trial Order at 25.[1]  Rather, its claim clearly "sound[ed] in trade dress" because it consistently represented "that it was the combination of Fetzer's buffalo with the reference to 'bourbon' in 'BOURBON BARREL AGED' that confused consumers as to the source of Fetzer's 1000 Stories wine." *Id.*[2]

On the trade dress claim, it first had to establish the BUFFALO TRACE trade dress's distinctiveness, either inherently or through secondary meaning.  But it "failed to submit any evidence that consumers rely on the Buffalo Trace trade dress to identify its source[,]" it "produced no evidence of direct consumer testimony showing that its claimed trade dress had acquired secondary meaning, nor did it provide a survey professing to demonstrate such[,]" and  it "provided no evidence that its marketing efforts effectively created secondary meaning, or that its sales are due to Buffalo Trace's trade dress." *Id*. at 27.  Even though its trade dress claim failed on this element, I proceeded to assess Sazerac's evidence on the remaining elements of the claim "just to emphasize the scarcity of the evidence Sazerac presented." *Id*. at 28.

Moving on to likelihood of confusion, I considered each of the *Sleekcraft* factors.  *See id*. at 28–33; *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1053–54 (9th Cir.

---

[1] On many points, Sazerac argues that it presented evidence, which I simply rejected, including the Johnson Survey and testimony from its 30(b)(6) representative and Senior Marketing Director of Premium Whiskeys, Kris Comstock.  Sazerac is correct that it offered this evidence.  The survey was "fatally flawed" with *zero probative value* and the testimony of its senior marketing director was conclusory at best and lacked credibility.  *See* Trial Tr. at 1004:11–25 (pointing out that Comstock hadn't reviewed documents before making estimates on the amount of promotional materials distributed and inflated the number of annual visitors to the distillery by a factor of three).

[2] In retrospect, Sazerac's position was questionable from the beginning.  It claimed that the combination of the word "bourbon" and the realistic depiction of a buffalo on 1000 Stories' label risked consumer confusion, and I allowed the claims to proceed past summary judgment because the likelihood of confusion analysis is based on how the products appear in the marketplace.  But it simultaneously admitted that it does not—and cannot—assert rights over the word "bourbon," which is why "bourbon" was not included as an element of its asserted trade dress.  By asking that the portion of the 1000 Stories' label indicating "Bourbon Barrel Aged" be considered as part of Fetzer's trade dress and considering that Buffalo Trace *is* a bourbon, bourbon necessarily factored into the likelihood of confusion analysis. *But see* 1 McCarthy on Trademarks and Unfair Competition § 8:3 (5th ed.)("[T]he ultimate decision on infringement of trade dress is different from that of patent law and is determined by comparing the totality of the elements defined by plaintiff with the corresponding elements in the accused product and deciding if there would be a likelihood of confusion.").

United States District Court
Northern District of California

1999)(reciting *Sleekcraft* factors).  On the similarity of the trade dresses, I concluded that "[t]he similarities are limited" and "the differences overwhelm." *Id.* at 29.  The relatedness of the goods factor weighed just slightly in Sazerac's favor because both products "participate in the same general alcoholic beverage industry" and "are advertised and marketed in overlapping channels." *Id.* at 30.  But they are indisputably distinct products with "different alcohol contents and social uses, and they occupy different sections of the stores where are offered for sale."

Moving on to the next factor, I determined that the trade dress was conceptually strong, but "[w]hen considering that evidence in the context of the widespread use of buffalo marks by others in the alcoholic beverage industry, I [was] not convinced that Sazerac's Buffalo Trace trade dress is commercially strong." *Id.* at 30–31.  On Fetzer's intent, I found that "Sazerac failed to present any evidence that Fetzer adopted the 1000 Stories trade dress with an intent to cause consumer confusion." *Id.* at 31.  Sazerac presented "no evidence of a single instance of actual confusion[,]" which I found quite compelling considering the products' "extensive presence, coexistence, and interaction with consumers" over three years, and "the fact that the products even appeared two tables apart from each other at the 2016 Bourbon Classic[.]" *Id.* at 32.  "Sazerac presented some evidence of overlap in the parties' marketing channels.  But the narrow overlap [was] dwarfed by the other factors, especially considering that the products occupy different places in the market." *Id.* at 32–33.

There was no evidence that either party intended to expand its brand into the other's particular market, and because Sazerac "failed to submit any evidence that the companies *actually* compete with one another," the expansion factor was not minimized to one of "relative unimportant[ce]," as Sazerac urged.  *Id.* at 33.  I concluded that the "degree of care" factor favored Fetzer because 1000 Stories is a "double niche" product (considering price point and varietal), so "[p]urchasers … are expected to exercise a high degree of care and are less likely to make mistakes" regarding product affiliation.  *Id.* at 33.

In sum, six out of the eight factors weighed heavily in Fetzer's favor due to the lack of meaningful evidence offered by Sazerac.  The other two factors—relatedness and marketing channels—weighed slightly in Sazerac's favor, mainly because the products are both alcoholic

beverages, with some overlapping target demographic as male bourbon drinkers.

After finding no trademark infringement, no distinctiveness of the trade dress, and no likelihood of confusion, I proceeded to briefly address Sazerac's entitlement to injunctive relief—the only form of relief available to it because of its manner of litigation—and concluded that it "offered zero evidence that its goodwill was actually damaged by 1000 Stories."[3]  *Id.* at 34.

### LEGAL STANDARD

Under the Lanham Act, a prevailing party may recover reasonable attorney fees in "exceptional cases." 15 U.S.C. § 1117(a).  The fee-shifting provisions in the Patent Act and the Lanham Act are "parallel and identical[,]" so that an interpretation of one guides the interpretation of the other.  *SunEarth, Inc. v. Sun Earth Solar Power Co.*, 839 F.3d 1179, 1180 (9th Cir. 2016)(quoting another source)(citation omitted).  In *SunEarth*, the Ninth Circuit decided that the Supreme Court's recent interpretation of the Patent Act's fee shifting provision applies to the Lanham Act.  *Id.*  "The Supreme Court explained that an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated."  *Id.* (quoting *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, ___ U.S. ___, 134 S. Ct. 1749 (2014)).

No "precise rule or formula" controls and "equitable discretion should be exercised[.]" *Octane Fitness*, 134 S. Ct. at 1756.  District courts should look to the "totality of the circumstances[,]" *id.*, and consider the Supreme Court's "nonexclusive list of factors, including frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence."  *Id.* at 1756 n.6.

---

[3] Earlier in the order, I noted  "[n]o sales of Buffalo Trace bourbon have been lost as a result of anything 1000 Stories has done.  Comstock Test. at 194:21-24.  To the contrary, the evidence is that sales of Buffalo Trace have continued to increase since 1000 Stories entered the market. Comstock Test. at 86:6-10; DeSarno Test. at 300:20-301:1."  Trial Order, Findings of Fact ¶ 80. And, "[t]here is no evidence of any sales of 1000 Stories wine having been made as a result of any consumer making some sort of association with Buffalo Trace bourbon.  Comstock Test. at 195:4-7."  *Id.* ¶81.

Once a prevailing party establishes its right to recover fees, the district court must determine whether the amount requested is reasonable. *See* 15 U.S.C. § 1117(a); Hensley v. Eckerhart, 461 U.S. 424, 437 (1983).

### DISCUSSION

Fetzer argues that this "case qualifies as 'exceptional' under both the 'strength' and 'manner' aspects of the test based on the sheer lack of evidence presented on the vast majority of elements essential to Sazerac's claims." Mot. at 2 (Dkt. No. 150); Reply at 2 (Dkt. No. 156). It points to numerous locations in the Trial Order to insist that Sazerac's claims had "exceptionally low merit," therefore supporting its position that this case is "exceptional." It seeks to recover $1,504.767.17 in attorney's fees it actually incurred. In the alternative, it requests $518,817.73 in fees incurred after the summary judgment order, which precluded Sazerac from recovering monetary damages, because Sazerac knew it lacked evidence of irreparable harm.

Sazerac urges that this case is not "exceptional" and it would be unfair to penalize it for proceeding to trial after surviving Fetzer's motion for summary judgment. To the extent that Fetzer is entitled to recover fees, Sazerac agrees that Fetzer's hourly rates are reasonable but disputes the reasonableness of the hours billed.

## I.   ENTITLEMENT TO FEES

### A.   The Standard

Fetzer relies on Sazerac's lack of evidence supporting trademark infringement, inherent or acquired distinctiveness and likelihood of confusion, and its unreasonable decision to proceed to trial with no evidence of irreparable harm, which is required to obtain a permanent injunction (the only relief available to it after summary judgment). Sazerac, on the other hand, highlights the rarity of "exceptional" cases and insists that "[f]ollowing Fetzer's logic" would render "*any* trademark case in which a plaintiff's claims are dismissed on a Rule 12 or summary judgment motion … 'exceptional' because that  plaintiff would be guilty of bringing a 'substantively weak' case." Opp'n at 2 (Dkt. No. 154).

6

United States District Court
Northern District of California

Sazerac stretches "Fetzer's logic" past the point of recognition.[4]  A finding that Fetzer has met its burden in establishing this as an "exceptional" case would say little about a plaintiff's claims that are dismissed or adjudicated before trial because it is the "totality of the circumstances" that dictates the outcome.  *Octane Fitness*, 134 S. Ct. at 1756.  Sazerac seems to suggest that a case should only be found "exceptional" after a showing of improper motivation, litigation misconduct, or objective unreasonableness.  Opp'n at 10; *see also id*. ("Sazerac is unaware of any trademark case in the Ninth Circuit … in which a court has found that fees would be **in**appropriate under a 'pre-*Octane*' standard, but appropriate under a so-called 'post-*Octane*' standard.")(emphasis in original).  But that is no longer the standard for awarding fees.  *See, e.g.*, *Apple Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK, 2014 WL 4145499, at *9 (N.D. Cal. Aug. 20, 2014)("[T]he standard for awarding attorneys' fees is no longer objective baselessness[.]").

Fetzer agrees that it is not arguing that Sazerac operated in bad faith or had an improper motivation, although it contends that "there were frivolous components to the case."  Reply at 1.[5]  Moreover, it insists that under the current standard this is an exceptional case due to the lack of evidence and Sazerac's unreasonable decision to proceed to trial with no evidence of actual harm, knowledge which was exclusively within Sazerac's possession.

Sazerac cannot legitimately dispute that *Octane Fitness* changed the standard and that the change entails a "more relaxed" approach.  *See SunEarth*, 839 F.3d 1179, 1181 ("We [the Ninth Circuit] agree with the majority of our sister circuits and conclude that *Octane Fitness* and *Highmark* have *altered the analysis* of fee applications under the Lanham Act.")(emphasis added); *Amusement Art, LLC v. Life is Beautiful, LLC*, 2017 WL 2259672, at *3 (C.D. Cal. May 23, 2017)(referring to *Octane Fitness* as a "more relaxed standard[]"); *ThermoLife Int'l, LLC v.*

---

[4] Although, as Fetzer notes, Sazerac presents a "curious argument[] given that trademark cases dismissed on summary judgment **are** exceptions to the rule."  Reply at 10.

[5] It also dispels Sazerac's notion that it did not argue that "considerations of compensation and deterrence" support awarding fees here.  Reply at 3 n.1; *see* Opp'n at 11 (claiming Fetzer's motion did not argue this factor).  It did argue this factor, Mot. at 15, and that is one of the reasons I am awarding fees.

*Myogenix Corp.*, 2017 WL 1235766, at *3 (S.D. Cal. Apr. 4, 2017)("Under the new analysis, a case may warrant a fee award if the litigation is brought in subjective bad faith, <u>or</u> if the litigation is objectively baseless—both are no longer required.")(emphasis in original).  For this reason, I will focus only on post-*Octane* cases.  *See* Reply at 3 (noting Sazerac's reliance on pre-*Octane* cases).  And given that the Ninth Circuit issued its decision in *SunEarth* finding that *Octane Fitness* applies to the Lanham Act just over a year ago, and the unavoidable reality that "exceptional" cases are rare, it is not surprising that there are few cases cited by Fetzer.  For this reason, and because the Lanham Act's fee-shifting provision mirrors that of the Patent Act, it is appropriate for Fetzer to also rely on patent cases.  I note, however, that the persuasiveness of patent cases is necessarily caged by the distinct standards unique to patent law.  *See, e.g.*, *ThermoLife Int'l, LLC v. Myogenix Corp.*, No. 13CV651 JLS (MDD), 2017 WL 1235766, at *5 (S.D. Cal. Apr. 4, 2017)("Federal Circuit 'case law makes clear that the key factor in determining whether a patentee performed a reasonable pre-filing inquiry is the presence of an infringement analysis.'")(quoting *Q-Pharma, Inc. v. Andrew Jergens Co.*, 360 F.3d 1295, 1302 (Fed. Cir. 2004)).

### B.      Substantive Strength of Sazerac's Case

Under the first prong of *Octane Fitness*, "[t]he Supreme Court explained that an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case)[.]" *SunEarth*, 839 F.3d at 1180.  Any time a court embarks on a "totality of the circumstances" test, it is left to assess the particular circumstances of the case before it, many times without the guidance of a completely analogous case.

I find myself in that situation here.  I begin with the non-exhaustive list of factors from *Octane Fitness*, "including frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence.").  *Octane Fitness*, 134 S. Ct. at 1756 n.6.  Fetzer

does not argue that the *entire* case was frivolous[6] or that Sazerac had an improper motivation in bringing it. But it insists that the claims were unreasonable "from the outset," in part because of the "complete lack of evidence of any irreparable harm." Reply at 8. This lack of evidence of actual irreparable harm undoubtedly factors into the substantive strength of Sazerac's case, discussed directly below. But it is more pertinent to the manner in which this case was litigated, which I discuss later in section I.C.[7]

Fetzer first cites to *Universal Electronics, Inc. v. Universal Remote Control, Inc.*, in which a court decided the defendant's motion for attorney's fees under the Patent Act. 2015 WL 12733442 (C.D. Cal. Mar. 10, 2015). The plaintiff had asserted four patents in its complaint, but the court's claim construction order invalidated the only claim in one of the patents. *Id*. at *1. The court thereafter decided on cross-motions for summary judgment that one of the patents was not infringed and no damages were available for another given plaintiff's failure to comply with the marking requirement. *Id*. at *2. The remaining claims proceeded to trial where the jury returned a verdict in favor of the defendant. *Id*. Fetzer highlights the court's analysis with respect to one of the patents, for which no pre-suit nor post-suit damages were available, and therefore plaintiff's failures regarding its own marking compliance "contribute[d] to the exceptional nature of [the] case." *Id*. at *3–4. Fetzer likens this situation to the absence of any available remedy for Sazerac, given its failure to disclose an expert on monetary damages and its knowledge that it lacked *evidence* of actual harm. Mot. at 13–14; *see infra* section I.C.

---

[6] As previously noted, it does contend that "there were frivolous components to the case, including proceeding after the summary judgment order and both bringing and maintaining trademark infringement claims that had no semblance of merit." Reply at 1; *see also* SJ Order at 9–10 (noting that "[Sazerac] devotes the majority of its likelihood of confusion analysis to its trade *dress* claim, which may be a concession that there are no genuine disputes regarding its trade*mark* infringement claims.")(emphasis in original). The frivolity of proceeding after the summary judgment order with no evidence of irreparable harm is discussed below in section I.C.

[7] The issue of irreparable harm has been hotly contested in this case. Following the hearing on this motion, Sazerac submitted a "Supplemental Pocket Brief" on the issue of whether consumer confusion could satisfy a showing of irreparable harm justifying injunctive relief. Dkt. No. 158. It did not seek leave to file it, as it should have under Civil Local Rule 7-3(d), but because I expressed interest in cases addressing this precise issue, and because Fetzer filed a response (first objecting to Sazerac's brief and then requesting leave to file a response, which it attached), I see no prejudice in considering it and Sazerac's response.

United States District Court
Northern District of California

Fetzer next analogizes the present situation to the *Universal Electronics* court's change in position between summary judgment and trial regarding defendant's laches defense. *Id.* at 14; *see Universal Electronics*, 2015 WL 12733442, at *5 (noting that the undisputed facts were insufficient to grant summary judgment but "after hearing all of the evidence at trial" laches precluded plaintiff's claim). The court ultimately found that compensation and deterrence "will be adequately served by requiring Plaintiff to pay for the portions of the case" the court determined were "exceptional." *Id.* at *8.

Some of the analysis in *Universal Electronics* provides helpful context for my determination here. As in *Universal Electronics*, that claims proceeded to trial post-summary judgment is not enough to render the case *un*exceptional. But Fetzer does not note the gloss that covered the entirety of the court's analysis. It began by noting that it reviewed the record "mindful" of the evidence that plaintiff may have been motivated by a "desire for 'payback.'" *Id.* at *2. There is no similarly questionable motive here—Fetzer has never accused Sazerac of bad faith or improper motive. It does not dispute that Sazerac acted out of a desire to protect what it perceived as a potential loss of control over its brand. The real question is whether that perception was objectively unreasonable given the facts and the law. *See Octane Fitness*, 134 S. Ct. at 1756; *SunEarth*, 839 F.3d at 1180.

Next, Fetzer cites *ThermoLife International, LLC v. Myogenix Corp.*, which was one of eighty-one related patent infringement lawsuits filed by the same plaintiffs. 2017 WL 1235766, at *1 (S.D. Cal. Apr. 4, 2017). After a five-day trial, the court concluded that each of the patents-in-suit were invalid. *Id.* In analyzing whether the case was "exceptional" under the "substantive strength" prong, the court considered whether the plaintiffs lacked a reasonable basis to allege infringement and noted that they "nowhere indicate[d] that they relied on anything other than advertisements before bringing suit." *Id.* at *4–5. On this point, the court concluded that "[d]efendants have submitted strong evidence that had Plaintiffs conducted any reasonable pre-filing investigation, they would have been on notice that at least some of the products in this litigation could not have infringed." *Id.* at *7. The court then moved on to address the manner in which the case was litigated and agreed with defendants that "[p]laintiffs' aggressive litigation

tactics; namely that [p]laintiffs sued many defendants in order to extract nuisance-value settlements" was behavior typical of a "patent troll" and "weigh[ed] in favor of finding [the] case to be exceptional." *Id.* In short, the court summarized:

> [U]nder the totality of the circumstances Defendants have shown that this case is exceptional such that an award of attorney fees is justified. In particular, Plaintiffs' pre-filing investigation was severely lacking, thus resulting in frivolous claims and the objective unreasonableness of certain infringement contentions; Plaintiffs' motivation was seemingly to extract nuisance-value settlements from a large number of defendants; and awarding fees here will advance compensation- and deterrence-oriented goals.

*Id.* at *8. Thus, it awarded fees even though plaintiffs had escaped defendants' summary judgment motion, just as Sazerac did here.

In Reply, Fetzer re-visits *Amusement Art*, which it cited in its motion for the proposition that an "exceptionally weak" case warrants an award of fees. Reply at 5; Mot. at 13 (citing *Amusement Art, LLC*, 2017 WL 2259672, at *4). The *Amusement Art* court found that the case stood apart from others, in part based on plaintiff's admission that "rights to the design in question sounded in copyright rather than trademark" and plaintiff provided no evidence of actual use as a trademark and no evidence that the mark would be recognized by a consumer as a source identifier. *Id.* at *4. The court noted that "this case is not one where there was inadequate evidence to create a triable issue but rather almost no evidence." *Id.* Fetzer seizes on this language, while neglecting to note that Sazerac's evidence was at least sufficient to defeat its motion for summary judgment on some of the claims.

In opposition, Sazerac's post-*Sun Earth* cases provide little more guidance; those courts denied motions for attorney's fees in much closer cases. In *Globefill Inc. v. Elements Spirits, Inc.*, the Ninth Circuit affirmed the district court's denial of defendant's motion for attorneys' fees "[u]nder either the standard established by *Octane* ... or by then-binding precedents" because plaintiff "presented compelling evidence relevant to many of the *Sleekcraft* factors, and its case was not so weak as to 'sufficiently set [it] apart[.]'" 640 F. App'x 682 (9th Cir. 2016). I did not see any compelling evidence from Sazerac and the case was weak enough to set it apart.

Sazerac also cites the district court decision following remand in *SunEarth, Inc. v. Sun*

United States District Court
Northern District of California

*Earth Solar Power*.  Case No. 11-4991-CW, Dkt. No. 229 (Feb. 22, 2017)(unpublished).  There, the Hon. Claudia Wilken denied plaintiff's motion for attorneys' fees given that some *Sleekcraft* factors weighed only slightly in plaintiff's favor and "[d]efendants' arguments were not frivolous and their litigating position was not objectively unreasonable."  *Id*. at 5.  On the manner of litigation factor, the court concluded that "[d]efendants' motivation in making these missteps was not wrongful, [p]laintiffs were compensated in the Court's contempt order for any harm they suffered, and there is no need for further deterrence sufficient to award fees against [d]efendants."  *Id*. at 6.  By contrast, here, many of the *Sleekcraft* factors weighed heavily in Fetzer's favor, and components of Sazerac's case were frivolous or objectively unreasonable.  *See supra* p. 3; Trial Order at 28–33.

In *Reserve Media, Inc. v. Efficient Frontiers, Inc*., the court denied plaintiff's motion for attorneys' fees even after granting it summary judgment and cancelling defendant's registered marks because its "position ... was not unreasonably or exceptionally weak" and it "submit[ted] evidence of some actual confusion from customers[.]"  2017 WL 2562098, at *1 (C.D. Cal. June 12, 2017).  Even though the court found several of the marks were unprotectable as a matter of law, "it was not unreasonable for [defendant] to attempt to police its rights against a new competitor in a related business domain who was using a mark with overlapping words."  *Id.* at *3.  To reiterate, Sazerac presented *zero evidence* of actual confusion.[8]  Although not required, this vacuum of actual confusion is notable.  *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1050 (9th Cir. 1999)("Although there may be the rare case in which a likelihood of future confusion is possible even where it is conceded that two marks have been used simultaneously for years with no resulting confusion, West Coast has not shown this to be such a

---

[8] In opposition, it points to the Johnson survey to support its view that it introduced evidence, which I rejected.  Opp'n at 7, 17.  Even accepting the "fatally flawed" Johnson Survey as evidence of confusion, Trial Order, Findings of Fact ¶ 60 (citing Simonson Test. at 586:14–22), the majority of respondents that reported the false belief that the products came from the same company or had a business relationship identified the buffalo logo as the source of their confusion, as opposed to other options such as "label" or "looks similar."  Johnson Survey (Dkt. No. 76-9).  If anything, the survey may have supported the *Sleekcraft* "actual confusion" factor for Sazerac's *trademark* infringement claim based on the large buffalo mark, but—given the results—it cannot legitimately point to this same survey to support its independent claim for trade dress infringement.

United States District Court
Northern District of California

United States District Court
Northern District of California

case."); *Am. Int'l Grp., Inc. v. Am. Int'l Bank*, 926 F.2d 829, 835 (9th Cir. 1991)("Lack of actual confusion during such a substantial period of concurrent use in the same geographic market establishes there is no likelihood of confusion; if confusion were a real problem, it would have happened already."); *Cutting Edge Sols., LLC v. Sustainable Low Maint. Grass, LLC*, No. 14-CV-02770-WHO, 2014 WL 5361548, at *13 (N.D. Cal. Oct. 20, 2014)("[W]here competing marks have been in use for a significant period of time, lack of actual confusion is significant."). This absence of confusion is especially critical considering Sazerac's reliance on consumer confusion to establish its harm. *See infra* section I.C.

This brings me to another decisive difference between this case and those listed above. Sazerac's main claim was doomed both before and after analysis of the *Sleekcraft* factors. Since its trade dress was at issue, Sazerac first had to prove the distinctiveness of the BUFFALO TRACE trade dress. It failed to do that. And if it had done that and the *Sleekcraft* factors somehow weighed in its favor, it still failed to offer any evidence of harm, thereby dooming the only relief available to it. *See infra*.

Perhaps the most helpful case cited by either side is *Caiz v. Roberts*, 2017 WL 830386 (C.D. Cal. Mar. 2, 2017). Caiz, a hip-hop artist with a registered trademark for "Mastermind," sued hip-hop artist Roberts and additional parties for trademark infringement and related claims after Roberts began referring to himself as "Mastermind," released an album titled "Mastermind," and named his tour "Mastermind." *Id*. at *1. Defendants argued they were entitled to an award of fees because the court, on summary judgment, had "cancelled [p]laintiff's 'Mastermind' trademark by finding the mark was descriptive, did not acquire secondary meaning, and because [p]laintiff failed to support his federal dilution claim." *Id*. at *3.

The court denied defendants' motion for attorneys' fees "because [p]laintiff had a registered trademark, his motivation in pursuing the lawsuit was to police and enforce his trademark rights, and the case was not objectively unreasonable both in the factual and legal components of the case." *Id*. It specifically addressed the reasonableness of plaintiff's belief that his mark did not require a showing of secondary meaning, *id*. at *3, and his failure to address his federal dilution claim in opposition to defendants' motion for summary judgment, *id*. at *4. On

13

the latter point, it found the lack of evidence related to one claim was not enough to find the case exceptional. *Id*. On the former point, it noted that it did not find plaintiff's arguments persuasive but that plaintiff had set forth good faith arguments and evidence he believed supported his position. *Id*. at *5. The court declined to accept defendants' invitation to find the case exceptional based on a lack of evidence in the absence of an improper motive or "a particular need ... to advance considerations of compensation and deterrence." *Id*. It concluded that defendants had failed to meet their burden to show the case was "exceptional" based only on plaintiff's failure of proof or lack of success. *Id*.

Fetzer distinguishes *Caiz* because it "outlined in detail the complete lack of merit to every aspect of Sazerac's claims, from each of the six trademark claims, to the trade dress claim, to every one of the eight *Sleekcraft* factors, to the claim for injunctive relief." Reply at 3–4 (footnote omitted)(citing Mot. at 11–13). It also emphasizes that no trade dress was at issue in *Caiz*, which rendered plaintiff's trademark registration more probative,[9] nor was irreparable harm at issue,

---

[9] On this point, Sazerac continues to "believe[] that its incontestable rights in the Buffalo Logo … obviated the need for it to establish that its trade dress had secondary meaning." Opp'n at 15 n.7. This is clearly a misstatement of the law. *See Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 210, 120 S. Ct. 1339, 1343, 146 L. Ed. 2d 182 (2000)("Nothing in § 43(a) explicitly requires a producer to show that its trade dress is distinctive, but courts have universally imposed that requirement, since without distinctiveness the trade dress would not 'cause confusion ... as to the origin, sponsorship, or approval of [the] goods,' as the section requires.").

Sazerac continues to blur the lines between its trademark and trade dress infringement claims. Part of the problem here, is that Fetzer was correct in its motion for summary judgment when it argued that "[t]his case is about Sazerac's improper efforts to exclude all others from using in commerce the generic term 'bourbon barrel aged' in conjunction with any image of a buffalo." Fetzer's MSJ at 1 (Dkt. No. 63). Sazerac itself reinforced this perspective during closing arguments. *See* Trial Tr. at 985:10–13 ("It's the use of a life-like rendering of a buffalo on a alcoholic beverage product, with the words 'Bourbon Barrel Aged' on the bottle, on the label, on a product that is marketed to consumers of bourbon."); *id*. at 990:8–10 ("To the extent that they're allowed to use a mark along with the words 'Bourbon Barrel Aged' that creates confusion, it necessarily implies that we are being harmed in that sense."); *id*. at 1033:6–12 ("[Y]ou also have to consider the inclusion of the words 'Bourbon Barrel Aged' on their label. And we have never contended that those words, in and of themselves, are protectable as trademarks. But that's part of the presentation of the defendants' mark here. And it enhances the likelihood of confusion."). Sazerac's survey expert may have been confused as well. Part of the reason it was "fatally flawed" was because the control didn't use the word "bourbon." Johnson indicated that it was his understanding that Fetzer's use of the phrase "Bourbon Barrel Aged" was somehow wrongful.

On summary judgment, I was mindful of "the wisdom of the well-established principle that because of the intensely factual nature of trademark disputes, summary judgment is generally disfavored in the trademark arena." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand*

14

United States District Court
Northern District of California

whereas here it was the only form of relief available to Sazerac at trial.

I agree that this case is different for the reasons stated by Fetzer.  Those differences are compelling.  But Fetzer cannot ignore that the case differs for other important reasons as well; namely, that Sazerac presented enough evidence to largely defeat Fetzer's motion for summary judgment, allowing the case to proceed to trial.

Once Sazerac survived Fetzer's motion for summary judgment (which did not address the issue of irreparable harm),[10] it was contingent upon Sazerac to present evidence to succeed at trial. Instead, it essentially relied on the meager disputed facts that enabled it to survive summary judgment on distinctiveness and likelihood of confusion and it elected to rely on a finding of likelihood of confusion to establish its harm.[11]  These deficiencies effectively render its entire manner of litigation wholly unreasonable.  In this vein, Fetzer points to *both* prongs of the *SunEarth*/*Octane Fitness* standard to support its position—not only does this case "stand[] out from others" given its exceptional weakness, but also it was litigated unreasonably.

Sazerac may have had a subjectively legitimate reason for bringing this lawsuit and it raised "debatable issues" sufficient to defeat Fetzer's motion for summary judgment as to two of its trademark claims and its trade dress infringement claim.  *See Nutrivita Labs., Inc. v. VBS*

---

*Mgmt., Inc.*, 618 F.3d 1025, 1031 (9th Cir. 2010)(quotation marks and citation omitted).  Viewing the evidence in favor of Sazerac, I rejected Fetzer's contention and concluded that Sazerac might be able to prove a likelihood of confusion without asserting rights over "bourbon."  It became clear at trial that Sazerac's case hinged on the "bourbon" reference and the buffalo, as Fetzer had insisted in summary judgment.

[10] Sazerac points out that Fetzer never moved for summary judgment on the issue of irreparable harm, nor did it seek leave to do so, nor did it move for a directed verdict on the issue at trial. Sazerac's Supp. Pocket Br. at 1.  But these facts do not and cannot absolve Sazerac of the burden of proving its case, or at least offering *some* evidence in support.

[11] In a footnote in its opposition, Sazerac confusingly comingles the concepts of "harm" and "damage," and seems to suggest that the summary judgment order preventing it from introducing evidence at trial of monetary damages somehow impacted its ability to offer evidence of actual harm.  *See* Opp'n at 17 n.8.  This is nonsense.  I am not responsible for Sazerac's failure to offer an expert on damages as it had indicated in its initial disclosures, and I did not prevent it from presenting evidence of *reputational* damage, or any other form of irreparable harm.  And, while Sazerac complains that I "depriv[ed] Sazerac ... its Seventh Amendment right to a jury trial," *Id*., Sazerac *stipulated to* a non-jury trial given its own blunder.  *See* Joint Pre-Trial Conference St. at 10 (Dkt. No. 87).

*Distribution Inc.*, 160 F. Supp. 3d 1184, 1192 (C.D. Cal. 2016)("In cases where the Ninth Circuit has affirmed the district court's denial of attorneys' fees based on a finding that [a Lanham Act] case was not exceptional, the key factor appears to be that the plaintiff raised 'debatable issues' and had a legitimate reason for bringing the lawsuit.")(quoting another source).  But, once it forfeited the right to pursue damages and the case "officially" became about injunctive relief,[12] it was unreasonable for it not to present any evidence of irreparable harm.

### C.   Manner of Litigation

Under the second prong of *Octane Fitness*, a court may find a case "exceptional" given the "unreasonable manner in which [it] was litigated."  *SunEarth*, 839 F.3d at 1180.  Sazerac misconstrues the issue when it argues that it "is unaware of any court that has found a case 'exceptional' because a party should have voluntarily dismissed its claims after surviving summary judgment."  Opp'n at 16.  The real issue is that it *offered no evidence* that its "consumers were being confused, its brand was being diminished, and its goodwill was undermined."  *See id*. This evidence, if it had existed, would have been uniquely within Sazerac's possession.  It was incumbent upon it to produce.

During the hearing and in its supplemental brief, Sazerac represented that "several courts have held that evidence of harm is not required for a court to grant a permanent injunction upon a showing of likelihood of confusion[.]"  Supp. Br. at 5 (capitalization omitted).  This argument was foreclosed by the decision in *Herb Reed Enterprises, LLC v. Florida Entertainment Management, Inc.*, in which the Ninth Circuit stated, "[g]one are the days when once the plaintiff in an infringement action has established a likelihood of confusion, it is ordinarily presumed that the plaintiff will suffer irreparable harm if injunctive relief does not issue."  736 F.3d 1239, 1250 (9th Cir. 2013)(internal quotation marks and alterations omitted).  Rather, "[t]hose seeking injunctive relief must proffer evidence sufficient to establish a likelihood of irreparable harm."[13]  *Id*. at 1251;

---

[12] In closing arguments, Sazerac argued that "this case has never been about money[,]" Trial Tr. at 988:11, which suggests that it has always been about injunctive relief.

[13] Sazerac aims to distinguish *Herb Reed* because it was decided at the preliminary injunction stage.  Supp. Br. at 4 n.3.  But the Ninth Circuit explicitly cited previous cases in which it "held that likely irreparable harm must be demonstrated to obtain a preliminary injunction in a copyright

United States District Court
Northern District of California

United States District Court
Northern District of California

*LG Corp. v. Huang*, 2017 WL 476539, at *11 (S.D. Cal. Feb. 6, 2017)("Although irreparable harm was once presumed in meritorious trademark infringement actions, irreparable harm now '<u>must be demonstrated</u> to obtain a permanent injunction in a trademark infringement action.'")(emphasis in original); *Anhing Corp. v. Thuan Phong Co. Ltd.*, 2015 WL 4517846, at *5 (C.D. Cal. July 24, 2015)("A district court may not assume irreparable harm merely upon a showing of infringement."). None of the cases cited by Sazerac hold otherwise. *See Nestlé USA, Inc. v. Gunther Grant, Inc.*, 2014 WL 12558008, at *17 (C.D. Cal. May 13, 2014)("Although post-*eBay*, a court can no longer presume irreparable injury from the bare fact of liability in a trademark or trade dress case, the injury caused by the presence of infringing products in the market—such as lost profits and customers, as well as the damage to the trademark holder's goodwill and business reputation such products cause—will often constitute irreparable injury."); *Kreation Juicery, Inc. v. Shekarchi*, 2014 WL 7564679, at *12 (C.D. Cal. Sept. 17, 2014)(finding irreparable harm to plaintiff's goodwill and reputation because plaintiff offered evidence that defendant was diverting customers and damaging plaintiff's reputation by serving non-organic food, when plaintiff had a reputation for offering organic ingredients); *OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc.*, 602 F. App'x 669, 672 (9th Cir. 2015)("Although the district court's finding of reputational injury was not based on any evidence that West's lookalike tire was an inferior product … the court's finding of goodwill injury was supported by some record evidence[,]" including losing a customer to defendant and risk that the customer could have conveyed confidential information)[14]; *Toyo Tire & Rubber Co. v. Kabusikiki Kaisha Tokyo Nihoon Rubber Corp*, 2015 U.S. Dist. LEXIS 146294, at *10 (D. Nev. Oct. 26, 2015)(finding "sufficient facts to support an inference of

---

infringement case and that *actual irreparable harm must be demonstrated to obtain a permanent injunction in a trademark infringement action.*" 736 F.3d at 1249 (emphasis added). This excerpt suggests that Sazerac's argument was nullified long before *Herb Reed*. *See Reno Air Racing Ass'n., Inc. v. McCord*, 452 F.3d 1126, 1138 (9th Cir. 2006)("[D]istrict courts should apply 'traditional equitable principles' in deciding whether to grant permanent injunctive relief," including whether the plaintiff has demonstrated "that it has suffered an irreparable injury[.]").

[14] Notably, the *OTR Wheel* court cited *Herb Reed* as "holding that likelihood of irreparable harm must be based on evidence in the record, not 'unsupported and conclusory statements regarding harm [the plaintiff] *might* suffer[.]'" 602 F. App'x at 672 (quoting *Herb Reed*, 736 F.3d at 1250–51)(emphasis in original).

irreparable harm" given defendant's "piggy-back[ing] off of [plaintiff's success"); *Brooklyn Brewery Corp. v. Black Ops Brewing, Inc.*, 156 F. Supp. 3d 1173, 1185 (E.D. Cal. 2016)("In the context of trademark law, a finding of irreparable harm must be grounded in evidence not in conclusory or cursory allegations[,]" and finding such evidence because defendant used plaintiff's marks to sell beer); *Verified Nutrition, LLC v. Sclar*, 2017 WL 4785948, at *5 (C.D. Cal. Oct. 23, 2017)(finding reputational injury in a false advertising case where defendants' websites included false information and plaintiffs' submitted evidence that defendants' websites were "gaining traction" thereby affecting "[p]laintiffs' websites being on the top of the list").

Sazerac is not truly arguing that evidence of harm is not required, even though it stated just that.[15]  Rather, it insists that it introduced evidence of harm in its loss of control over its brand. *See* Supp. Br. at 1–2 ("Sazerac had a reasonable belief … that it could have proved a likelihood of confusion and, subsequently, obtained *some sort of injunction* … based on its showing of likelihood of confusion *and evidence that Fetzer's actions undermine Sazerac's control of its decade-plus old brand and goodwill*.")(first emphasis in original, second emphasis added).[16]  The purported "loss of control over how it shapes its iconic and rapidly growing brand" was the only harm Sazerac pointed to in its proposed findings of fact.  Sazerac's Proposed Findings of Fact ¶ 130 (Dkt. No. 139).  But it relied only on the conclusory statements of Sazerac Brands, LLC's senior marketing director for premium whisky.  *See id*. (citing Comstock Test. at 169:4–170:7).[17]

---

[15] And further, seemed to concede the point in closing arguments.  *See* Trial Tr. at 989:7-11 ("And to conclude that: Well, because we didn't suffer any harm, we didn't focus on that at trial, you can't issue a permanent injunction after a full-blown trial if there is a determination that there is a likelihood of confusion. To me, that would not serve the purposes of trademark law"); *id*. at 988:17-20 ("The case law that is relied upon by Fetzer, number one, it all stems from a case in the patent world. It has bled over into trademark world. But those cases involve preliminary injunctions").  Sazerac is free to take the issue up with the Ninth Circuit, but in the presence of binding precedent to the contrary, *Herb Reed*, 736 F.3d at 1249, I cannot agree with it.

[16] Sazerac argues that it "would have been entitled to post-trial briefing on the scope of injunctive relief had the fact-finder ruled in its favor."  Opp'n at 17.  This is a considerable—and unwarranted—assumption.  But more critically, it misses the point that it still would have been bound by any evidence of harm submitted at trial.

[17] The cited portion of the Comstock testimony was:

> Q: And can you explain for me why Sazerac was concerned about
> Fetzer's 1000 Stories product?

18

United States District Court
Northern District of California

1    And, in its supplemental brief, it essentially admitted that it had not offered any evidence at all,

2    given the completely speculative nature of its nonexistent harm.  *See* Supp. Br. at 7 ("Because

3    Sazerac *would not have* been able to control its goodwill *if* consumers purchased Fetzer's wine

4    believing it to be put out or associated with Sazerac, there necessarily would be harm to

5    Sazerac.").

6         Let me illustrate the absurdity of Sazerac's position.  A consumer would have to purchase

7    1000 Stories wine—which, as I noted earlier, occupies a "double niche" market given its price

8    point and varietal—because s/he looks at the bottle and draws an association with Sazerac's

9    Buffalo Trace bourbon.  And, in envisioning this obscure possibility, keep in mind that Buffalo

10   Trace represents 0.5 percent of the whiskey market.  Now assume that this consumer is a bourbon

11   drinker (because that is 1000 Stories' target demographic) who goes to the store looking for a red

12   zinfandel.  S/he purchases 1000 Stories because s/he *knows of* Buffalo Trace *and associates* 1000

13   Stories with it because of the 1000 Stories trade dress.  Then, for Sazerac to suffer damage to its

14   good will, that consumer would have to dislike 1000 Stories to the point that it would impact his

15

16   A: Well, we see this as a big problem.  I mean, for the last decade,
     we've built our brand into a notable, recognized beverage brand.
17   With a buffalo as our icon.  And this product not only has a buffalo
     on it as well, but our bourbon is aged in bourbon barrels and this
18   wine is aged in bourbon barrels.  The buffalo represents both
     products, that we market ours at tasting events, they mark their
19   product at tasting events.  We advertise in the same magazines.
     They're clearly trying to target bourbon drinkers -- many of them are
20   our customers --and trade off the goodwill and the reputation that we
     have built over the last 17 years since we have launched Buffalo
21   Trace.

22   Q: And do you believe the depictions of the buffaloes on the Fetzer
     1000 Stories product and the Buffalo Trace Bourbon Whiskey
23   product are similar? [objection omitted]

24   A: I do.  They are both realistic-looking buffaloes.  Although they
     are facing different directions, they are strong, realistic depictions of
25   the animal.  The buffalo on this wine is not comical or silly, or it's
     not just a buffalo head, but it's realistic-looking buffalo that's close
26   enough to our buffalo to make us really uncomfortable and to lead
     us to believe that people will draw an association between a
27   bourbon-barrel aged wine with a buffalo on it with Buffalo Trace,
     you know, a famous bourbon maker.

28

or her perspective of Buffalo Trace, and, by implication, Sazerac, who, as an aside, owns over 350 brands. *See* 5 McCarthy on Trademarks and Unfair Competition § 30:2 (4th ed.) ("If it is likely that confused persons will mistakenly attribute to [the] plaintiff defects or negative impressions they have of [the] defendant's goods or services, then the plaintiff's reputation (and its signifying trademark) is at risk because it is in the hands of a stranger.").

In reality, there were no assertions that 1000 Stories is an inferior product that would lead to negative impressions, so the only potential harm to Sazerac would be a speculative and remote "loss of control" over one out of 350 of its brands. Accepting this extremely unlikely scenario to arrive at a finding of *any* harm would still have been insufficient for Sazerac to succeed, considering the other elements required for a permanent injunction. I fail to see how the balance of harms could tip in its favor, with such a featherweight of harm on its side, versus the harm Fetzer would experience if it was forced to change its label.[18] In short, after Sazerac was limited to injunctive relief, it had "no reasonable or legal basis to believe in success on the merits."[19] *Secalt S.A. v. Wuxi Shenxi Const. Mach. Co*., 668 F.3d 677, 687 (9th Cir. 2012), *abrogated by SunEarth, Inc. v. Sun Earth Solar Power Co.*, 839 F.3d 1179 (9th Cir. 2016).

Sazerac is right that "[t]he law does not punish brand owners that attempt to protect their rights and customers from confusion." Opp'n at 2. But the brand owner must have an objectively reasonable basis for believing that its rights are under attack and consumers are at risk of being confused. And that is not all. Sazerac cannot avoid that it had to demonstrate *some* harm—separate from the potential for confusion—to prevail. This case is exceptional because Sazerac offered little to no evidence: (1) that 1000 Stories was using any colorable imitation of any of Sazerac's asserted trademarks; (2) that it had any protectable trade dress; (3) on six of the eight *Sleekcraft* factors; and (4) of any type of irreparable harm. In the exercise of equitable discretion,

---

[18] Comstock testified, "we believe the best way to do that [mitigate the likelihood of confusion arising from the 1000 Stories wine product] is to remove the buffalo from the label." Comstock Test. at 175:19–176:2.

[19] And it cannot rely on protecting the public interest from confusion because that potential harm is necessarily subsumed within the likelihood of confusion. *See Herb Reed*, 736 F.3d at 1251 ("This approach collapses the likelihood of success and the irreparable harm factors.").

considering the preponderance of the evidence standard, and under the totality of circumstances, including elements of frivolousness, the "objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence[,]" *Octane Fitness*, 134 S. Ct. at 1756 n.6,  I find that this case "stands out from others."  *Id.* at 1756.

In sum, I find that this case is exceptional but limit the award of fees to those incurred after my summary judgment order, at which point it became objectively unreasonable to proceed without evidence of irreparable harm.  *See Universal Elecs., Inc.*, 2015 WL 12733442, at *8 ("[C]ompensation will be adequately served by requiring Plaintiff to pay for the portions of the case attributable to 'pursuing the claims with exceptionally low merit, and that this would 'also serve as adequate deterrence.'").

## II.      REASONABLENESS OF FEES

In calculating a fee award under the Lanham Act, "the district court must first determine the presumptive lodestar figure by multiplying the number of hours reasonably expended on the litigation by the reasonable hourly rate."  *Intel Corp. v. Terabyte Int'l, Inc.*, 6 F.3d 614, 622 (9th Cir. 1993).  "[I]n appropriate cases," this figure may be adjusted "based upon the factors listed in *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 69 – 70 (9th Cir. 1975)[.]"  *Id.*  The lodestar figure is presumptively reasonable.  *Jordan v. Multnomah Cty.*, 815 F.2d 1258, 1262 (9th Cir. 1987).

Fetzer submitted evidence of the fees actually incurred in defending this action.  Disharoon Decl. ¶¶ 12–17; *id.*, Ex. D (Dkt. No. 150-1); Holztapple Decl. ¶¶ 6, 11; *id.*, Ex. A (Dkt. No. 150-2); Wakefield Decl. ¶¶ 9–10; *id.*, Ex. A (Dkt. No. 150-3).  The fact that the fees have been paid by Fetzer Vineyards or its insurer "adds weight to the presumption of reasonableness."  *Stonebrae, L.P. v. Toll Bros*., No. C-08-0221-EMC, 2011WL 1334444, at *6 (N.D. Cal. Apr. 7, 2011).  Once the moving party provides its evidence, "the opposing party has the burden of submitting evidence challenging the accuracy and reasonableness of the hours charged or the facts asserted by the prevailing party[.]"  *Rodriguez v. Barrita, Inc*., No. C 09-04057-RS, 53 F. Supp. 3d 1268, 1280 (N.D. Cal. 2014)(internal quotation marks and citation omitted).

Sazerac agreed that Fetzer's "billing rates are not unreasonable[,]" Disharoon Decl. ¶ 4,

1    Ex. B (Dkt. No. 150-1 at 13) and I find those rates, which ranged from $95 per hour (Disharoon

2    Decl. ¶ 12) to $756.50 (Holtzapple Decl. ¶ 6) reasonable when compared to the prevailing rates in

3    this market. *See In re High-Tech Employee Antitrust Litig.*, No. 11-CV-02509-LHK, 2015 WL

4    5158730, at *9 (N.D. Cal. Sept. 2, 2015)(approving billing rates from $190 for support staff to

5    $975 for partners).

6         Sazerac, however, insists that Fetzer's request for fees is unreasonable because (1) "Fetzer

7    makes no argument that anything that happened prior to summary judgment was unreasonable,

8    lacking merit, or in bad faith[,]"[20] (2) it did not aim to distinguish between fees incurred in

9    defending the trademark infringement claim, as opposed to the trade dress infringement claim, and

10   (3) it failed to determine whether any fees were "unnecessary, or the result of inefficiency or

11   duplicated work by 21 timekeepers over three law firms." Opp'n at 23–24.   Since I am awarding

12   fees based on hours billed after summary judgment order (from May through August 2017), only

13   two firms were involved and I am not convinced that any of the hours billed by these two firms

14   were unnecessary or unreasonable.   In fact, Fetzer's counsel are commended for their efficiency

15   and skill in preparing the case for trial and in trying the case.   Sazerac fails to persuade me

16   otherwise.   *See* Peterson Decl. ¶3 (analyzing Fetzer's bills and concluding that it "seeks recovery

17   of attorneys' fees that were expended on unnecessary, inefficient, or unsuccessful tasks")(Dkt. No.

18   154-1).   The award of only a portion of Fetzer's total fees also negates Sazerac's other two

19   arguments against finding the fee request reasonable.

---

[20] In Reply, Fetzer dispels this argument, but it is not an issue since I am awarding fees based on hours worked after the summary judgment order.

United States District Court
Northern District of California

1

**CONCLUSION**

2      In accordance with the foregoing, Fetzer's motion for attorneys' fees is GRANTED IN

3 PART, in accordance with its alternative request for $518,817.73, the amount of fees actually

4 incurred after the summary judgment order.

5      **IT IS SO ORDERED.**

6 Dated: December 7, 2017

7

8

9 William H. Orrick

United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28